**In re A.P.I. INC., Debtor.**

**No. 05–30073.**

United States Bankruptcy Court, D. Minnesota.

Oct. 15, 2005.

James L. Baillie, Fredrikson & Byron PA, Minneapolis, MN, for Debtor.

ORDER ON DEBTOR'S MOTION FOR SUMMARY JUDGMENT IN PROCEEDINGS ON CONFIRMATION OF DEBTOR'S PLAN, RE: ISSUES RELATING TO PLAN'S EFFECT ON INSURERS' RIGHTS, INSURERS' STANDING, AND EXONERATION OF THIRD PARTIES

GREGORY F. KISHEL, Chief Judge.

This Chapter 11 case came on before the Court for hearing on various issues raised in the proceedings on confirmation of the Debtor's plan of reorganization.[1] Appearances were James L. Baillie on behalf of the Debtor; Michael L. Meyer on behalf of the Asbestos Claimants' Committee; Russell W. Roten on behalf of Great American Insurance Company ("GAIC"); David C. Christian, II on behalf of Continental Casualty Company and Transportation Insurance Company (collectively, "CNA"); Clark T. Whitmore on behalf of U.S. Fire Insurance Company; Michael F. Brown on behalf of One Beacon American Insurance Company; Craig M. Roen, special insurance litigation counsel for the Debtor; Gerald F. Ellersdorfer on behalf of Fire-

1. This hearing was the "Legal Issues Hearing" contemplated by the terms of a case procedures order, to which counsel for various parties had agreed. The Debtor's counsel used a motion under Rule 56 to queue up various issues that they believed could be addressed as matters solely of law, as to which there would be no factual controversy.

man's Fund Insurance Company; and Alan D. Pedlar on behalf of Thomas H. Carey, the "Legal Representative" under the Debtor's proposed plan. The following order memorializes the Court's rulings on the three major groups of contested issues presented via the motion.[2]

## BACKGROUND

To put the present matters into context, it is necessary to review relevant aspects of the Debtor's history before its Chapter 11 filing.[3] With various events that have occurred during the prosecution of this case, they are summarized as follows.

The Debtor has been in the business of installing insulation in commercial and industrial facilities for over 80 years. Until 1973, it used insulation materials containing asbestos. Beginning in the 1980s, the Debtor was sued by individuals who claimed that they had been injured by exposure to the asbestos in these materials. Several thousand such lawsuits have been prosecuted against the Debtor; about 700 of them were pending when the Debtor filed for reorganization under Chapter 11.

Over the decades of its operation, the Debtor had maintained various policies of liability insurance through a number of different insurers. For about twenty years, the insurers afforded the Debtor defense and indemnification in the asbestos-related lawsuits, without controversy over the Debtor's entitlement to that.[4] Several years ago, the insurers advised the Debtor that the amounts they had disbursed in indemnification had reached the limits of coverage under the policies. The insurers then declined to defend and indemnify the Debtor on any further asbestos-related claims.[5]

The Debtor disputed the insurers' right to terminate defense and indemnification. This led to litigation venued in the Minnesota State District Court for the Second Judicial District, Ramsey County. In that action, various parties including the Debtor sought declaratory judgment as to the existence, amount, and scope of insurance coverage still available to the Debtor under the various policies.[6] This complex lawsuit went forward over several years; retired members of the Minnesota state judiciary served as mediator and special master on discovery issues. It was scheduled for trial to commence in November, 2005.

During the same time, the Debtor and API Group, Inc., its parent, approached their major institutional creditors, the

---

**2.** Separate orders will memorialize the rulings on uncontested issues and on contested issues that do not require as extended a treatment.

**3.** In numerous submissions to the Court, counsel have referred in a broad way to various pre-petition events involving the Debtor and other parties to this case. Many of these statements are not in the record in a form under oath. However, the parties have not controverted any of them, and none are of a nature likely to bear on any substantive issue in this case.

**4.** The insurers' counsel allege that the great majority of these claims went through some

litigation and then were settled, often for fairly modest amounts. The Debtor has not disputed these allegations, thus far.

**5.** These advisories apparently came in the wake of a verdict adverse to the Debtor on an asbestos-related claim that went to trial. The verdict was in an amount many multiples of anything paid on the Debtor's account to any prior asbestos claimant.

**6.** All further references to "insurance coverage" will signify the indemnification, if any, that is still available to the Debtor for its liability on account of asbestos-related personal injury claims, under any pre-petition policy of liability insurance.

Debtor's trade suppliers, and the attorneys who represented the holders of asbestos-related claims against the Debtor. Those parties began negotiating the terms of a plan of reorganization that could be presented for confirmation, were the Debtor to file for relief under Chapter 11. The Debtor's parent and affiliated companies participated in the negotiations. The Debtor's goal was to draft a "pre-packaged" plan, using the special remedies that 11 U.S.C. § 524(g) grants to debtors that are subject to multiple claims arising out of exposure to asbestos. The intention was to present this plan to the bankruptcy court for confirmation soon after a bankruptcy filing, based on a pre-petition solicitation of acceptances.

The negotiations went on over several years. A committee of holders of currently-pending asbestos-related personal injury claims was formed pre-petition; it hired counsel and participated in the negotiations. The negotiating parties chose persons who would serve under the plan as a representative of persons who would assert asbestos-related personal injury claims against the Debtor in the future, as the trustee of a post-confirmation trust, and as a "Trust Advisor" to the trustee.

The Debtor did not solicit any of its insurers to participate in the pre-petition negotiations. None of the insurers did participate. The Debtor states that it and the other participants intended to formulate a plan that would leave all issues over the existence of insurance coverage for resolution in the coverage action in the Ramsey County District Court.

The Debtor filed its petition under Chapter 11 on January 6, 2005. On the next day, it filed a plan of reorganization.

The Debtor characterizes the plan as having two structural components. The first is a threshold of funding supplied by itself and its parent company. Those monies are to be administered through a trust for the benefit of holders of asbestos-related personal injury claims. The second is an administrative process for the proof, evaluation, rating, and payment of such claims through the trust. This process would not involve litigation as its primary mechanism for the great majority of such claims. The trust's corpus, and the individual realization by some holders of asbestos-related personal injury claims, may be augmented by monies payable by the insurers, if the Debtor prevails in the coverage action in any way. The Debtor maintains that the plan may be considered for confirmation regardless of the availability of insurance coverage. It also insists that the plan explicitly preserves all of the insurers' rights to defend the coverage action, and their rights to defend any asbestos-related personal injury claim on its merits if it were tendered to the insurers after a determination that the Debtor had insurance coverage for it.

On January 21, 2005, CNA, a party to the coverage action, removed that lawsuit to the United States District Court for this District, under color of 28 U.S.C. § 1452(a). The Debtor moved for an order of abstention and remand. By an order entered on March 23, 2005, the District Court (Magnuson, J.) granted the Debtor's motion.[7] The coverage action is now back in active litigation in the Ramsey County District Court.

Early in the Chapter 11 case, the parties aligned into two different camps. In the one lay the Debtor, its major lenders, the Asbestos Claimants' Committee that was

---

7. Judge Magnuson's decision is published in electronic format at 2005 WL 679072 (D.Minn.2005).

appointed to represent the interests of holders of pending asbestos-related personal injury claims, and the "Legal Representative" of parties presently unknown who could assert such claims against the Debtor in the future. In the other lay the insurance companies that opposed the Debtor in the coverage action. The insurers quickly took positions against the Debtor's proposal to expedite the process of confirmation of its pre-packaged plan. All counsel generally concurred that the Debtor's proposals and plan raised several issues that might be resolved without evidentiary development, purely on application of law. The thought was that resolution of those issues might simplify further proceedings in the case. Thus, the initial and amended case procedures orders provided for a "Legal Issues Hearing" early in the case, at which such matters would be submitted for decision.[8]

The issues treated in this order, and numerous others, were submitted for decision at that hearing.[9] The form of submission was proper, and all of the issues are amenable to disposition as matters of law.[10]

8. The case procedures orders were entered on terms to which all counsel had agreed. As observed at n. 1, the Debtor's counsel established the framework for this hearing by serving and filing a motion for summary judgment. (Though the Debtor's counsel were the sole signatories to the motion document, the parties that support the Debtor in urging confirmation joined in the supporting briefing—the Asbestos Claimants Committee, the Legal Representative, and API Group, Inc., the Debtor's parent company. Any further reference to "the Debtor" as a proponent of a particular argument or position should be understood as denoting all of these parties when the reference involves the confirmation of the plan at bar.) In oral argument, counsel for one or more insurers took umbrage to this structure, complaining that some of the subjects involved "obvious" issues of fact. The point seemed to be that counsel should have met, "stipulated all the relevant facts," *then* identified the issues, and afterward submitted briefing. Under all the circumstances, however, the Debtor's counsel proceeded appropriately. In the first place, the Court had suggested Rule 56 as a procedural vehicle, if nothing else seemed appropriate, and counsel were only following that lead. In the second, the Debtor's counsel were not out of line in just deciding to get on with it in a unilateral fashion. The early hearings in the case were quite contentious. The parties failed to make even nominal progress at narrowing the issues in an attempt at mediation, during a several-week "standstill." Some insurers' counsel repeatedly slipped into hostile, *ad hominem* rhetorical flourish during successive hearings. The Debtor's counsel apparently concluded that an effort to arrive at stipulated facts would entail too much delay and effort in light of the possible results, and probably thought that it would not result in enough articulated factual bases to enable meaningful rulings. There is nothing in the record to gainsay such thoughts. There is a bit too much to validate them. Somebody had to act constructively to push the "Legal Issues" process forward.

9. Since this motion was submitted for decision, GAIC entered into a comprehensive settlement with the Debtor, and the Court approved that settlement. As part of the accord, GAIC withdrew its own objections to confirmation and ceased its participation in the litigation in this case. GAIC was one of two insurers that most strenuously opposed the Debtor on the motion at bar, having raised in its own right most of the issues to be treated by the Court. CNA was the other. GAIC's departure does not moot the issues it raised, however, because most of the remaining insurers—CNA most prominent among them—had joined in all of GAIC's substantive objections, and continue to maintain them independently.

10. The procedural governance is of course furnished by Fed.R.Civ.P. 56, *as incorporated by* Fed. R. Bankr.P. 9014. Rule 56(c) allows a grant of summary judgment if all of the pleadings, discovery responses, and written evidentiary submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Most of the issues treated in this order concern the legal implications of the plan on its face. There is no need to

### THE DEBTOR'S PLAN

The Debtor's plan[11] is a complicated document. It contains 14 pages of definitions and an additional 28 pages of substantive content. It also incorporates by reference various separate "Revised Plan Documents," including a set of "Trust Distribution Procedures." Plan § 3.5.

In general, however, the plan provides that priority claims, both classified and unclassified, would be paid in full on its effective date, as would general unsecured claims. The Debtor also would "continue to be bound by its guarantees" of certain debts of its parent company, those debts being secured by liens against the Debtor's assets.

The Debtor's liability to the holders of asbestos-related personal injury claims is the focus of the plan. The details relating to those claimants that are relevant to the issues at bar are as follows.

The Debtor proposes to establish a trust for the benefit of members of this class of creditors, Plan § 6.1, and (along with its parent company) to provide initial and subsequent funding to the trust from business revenues and corporate assets, Plan §§ 5.1—5.2.[12] Under § 3.5 of the plan, all liability for asbestos-related personal injury claims would "be … automatically … assumed by and channeled to the [t]rust." The trust, then, would undertake the "liquidation, resolution, payment, and satisfaction" of all future asbestos-related personal injury claims in accordance with the terms of the Trust Distribution Procedures. Plan § 6.1.[13]

The asbestos-related claims that were pending and in suit as of the Debtor's bankruptcy filing would be paid by the trust, in stated amounts, pursuant to a separate settlement agreement between

resort to facts to dispose of these issues. It is well-settled that the summary judgment procedure is particularly suited to the construction and interpretation of contracts, insurance policies, and instruments on their face. *E.g., In re Minnesota Mut. Life Ins. Co. Sales Practices Litigation,* 346 F.3d 830, 834–837 (8th Cir.2003); *Medtronic, Inc. v. U.S. Xpress, Inc.,* 341 F.3d 798, 800–801 (8th Cir.2003); *Villines v. General Motors Corp.,* 324 F.3d 948, 952–953 (8th Cir.2003); *Richie Co., LLP v. Lyndon Ins. Group, Inc.,* 316 F.3d 758, 760–761 (8th Cir.2003). As framed up by the parties and as reflected in the submissions of record, the issue of the insurers' standing to object to confirmation does not present any triable issue of fact. Thus, it is equally suited for summary adjudication.

11. All references are to the "First Amended" version of the Debtor's plan, dated and filed March 2, 2005. After the "Legal Issues Hearing," the Debtor filed another, further-modified plan. However, all of the specifics of briefing and·argument focused on the "First Amended" iteration, those points were fully submitted, and that is what this decision will treat. The significance of the further modifications is a matter for another day.

12. Per the plan, the Debtor and its parent are committing a total of $41,000,000.00 to the trust, to be paid over a 20–year period, via an initial increment of $15,000,000.00 and periodic payments totaling $26,000,000.00 thereafter.

13. The Debtor distinguishes between "Direct" asbestos claims and "Indirect" asbestos claims. It defines the former as any "Asbestos Claim" by an individual "resulting from such individual's exposure to asbestos related to" the Debtor. Plan § 1.15(b). It defines the latter as any "Asbestos Claim" that is "based on a right of contribution, reimbursement, subrogation, or indemnity … and any other derivative or indirect Claim of any kind whatsoever …" Plan § 1.15(a). The substantive part of the plan affords different treatments to these two categories. The issues treated by this order do not concern the "indirect" asbestos claims or their holders, however. Thus, all further references in this order to "asbestos-related personal injury claims" or "asbestos-related claims" will generally pertain to the claims of individuals who allege injuries resulting from their own exposure to asbestos "related to" the Debtor.

their holders and the Debtor. Plan § 3.5; TDP §§ 2.1 and 4.1. The amounts payable by the trust on asbestos-related claims made in the future would be "estimated" according to a grid, after the trustee reviewed evidence submitted by the claimant. Plan § 3.5; TDP §§ 5.1(a)—(b). Once the claimant satisfied the trustee that he or she had had the requisite exposure to asbestos contained in the Debtor's products, the "allowed liquidated value" of the payable claim would be fixed by the "Disease Category" met by the claimant's medical proof.[14] TDP § 5.1(c). The trustee would pay the claims so "estimated" in a "first-in-first-out" order, as funding became available in the trust, and on an installment basis if warranted by the trust's current and anticipated means. Plan § 3.5; TDP §§ 5.1(e) and 5.1(h). When he made his first determination of terms of payment after the effective date of the plan, the trustee would have to obtain the consent of the Legal Representative and the Trust Advisor. For subsequent distributions, he would have to give them notice and to consult with them as to any change in terms of payment that he contemplated. TDP § 5.2(h).

The trust also would be empowered to pursue legal action against the Debtor's insurers, on the issues of coverage and other matters. The plan provides that the trust "shall succeed to all of" the Debtor's rights, as insured, under any insurance policy "upon which any claim has been or may be made with respect to any" asbestos-related personal injury claim. Plan § 5.4(a). It contemplates that all "proceeds arising from or under" any insurance policy will be recovered by the trust and administered for the benefit of all

holders of asbestos-related personal injury claims. Plan §§ 5.4(c) and 10.1.

The Trust Distribution Procedures reserve to the trustee a right to "seek[ ] insurance coverage in regard to" any individual asbestos-related personal injury claim. TDP § 2.4(a); Plan § 5.4(a). The pursuit of insurance coverage would be initiated as follows: Subject first to mediation at the trustee's instance, a claimant may elect to "commence a lawsuit" in an individual right against the trust on his claim. TDP § 5.2. A claimant may sue the trust with or without the "endorsement" of the Trust Advisor and the Legal Representative. TDP §§ 5.2(b)—(c). If an "unendorsed" suit is commenced, the trustee may, in his discretion, tender any such claim in suit to one or more insurers, for defense and indemnification. TDP § 5.2(b). The trustee may obtain an injunction against the prosecution of the claimant's litigation if it would "unduly burden the [t]rust" or would jeopardize the trust's ability to give "substantially similar treatment" to all present and future asbestos-related claims. *Id.*

In the alternative, the Trust Advisor and the Legal Representative are given a discretionary power to endorse the commencement of suit in an individual right by the holder of an asbestos-related personal injury claim, based on their analysis of various factors. In that event, the trustee would have to tender the defense of the claim to an insurer or insurers. If the claimant elected to pursue such litigation, estimation of the claim under the Trust Distribution Procedures, i.e., its valuation for the purposes of a distribution from the trust assets, would "be of no force and effect" in the claimant's lawsuit, TDP

---

**14.** The "allowed liquidated value" is fixed for two groups of claims, divided by the state of the claimant's residence. Minnesota residents fall in one group and residents of all other states are in the other. (The latter group is tagged as "North Dakota," apparently because of the current preponderance of claims by residents of that state.)

§ 5.2(c)(1); any insurer would "retain all of its claim handling rights under its policy," TDP § 5.2(c)(3). In the case of any claim put through such litigation, any "estimation" of the amount of the claim that would be generally effected through the bankruptcy court's approval of the Trust Distribution Procedures via confirmation "shall not be a finding or fixing of the amount of [the claim] with any binding legal effect other than for distribution purposes by the [t]rust under circumstances where a claim is not further pursued in a state or federal court system ... and shall not constitute a binding determination on any issue or the creation of a liquidated non-bankruptcy claim." Plan § 5.4(e). The "estimation" further "shall not be deemed to be a triggering event for liability under any" policy of insurance. Plan § 5.4(f).

The plan does not bar a claimant who sues out an asbestos-related personal injury claim from receiving payment from the trust.[15] If a claimant in an "unendorsed" lawsuit receives a judgment in his litigation, he would have a resultant claim against the trust in the amount of the actual, pecuniary damages awarded in the lawsuit. TDP § 5.2(b).[16] The "unendorsed" litigating claimant then would be entitled to a payment from the trust. This initial payment would be the lesser of two figures: 125% of the matrix-calculated claim otherwise attributable to the claim-

ant under the TDP, or an amount calculated on the base of the court award for compensatory damages times the proportion in which the trustee was then making matrix-calculated payments to claimants going through "estimation." *Id.* The balance of the amount of the judgment award for compensatory damages would still be payable by the trust, but only after "the initial payment in full of all other" "Direct" asbestos-related claims.[17]

Where the Trust Advisor and the Legal Representative elect to "endorse" a claimant's lawsuit against the trust, and they require the trustee to tender the claim to one or more insureds, the "estimation" of the claim under the TDP "shall be of no force and effect" in the resultant "Claimant Coverage Action." TDP § 5.2(c)(1). Again, the negative implication here is that the "endorsed" claimant may receive a distribution from the trust and still proceed with litigation. If the claimant receives a judgment, "[a]ll net insurance proceeds recovered as a part of the Claimant Coverage Action shall be the property of the Trust." TDP § 5.2(c)(4); *see also* Plan § 5.4(c). As part of their formal endorsement of a Claimant Coverage Action, the Trust Advisor and the Legal Representative "can make such financial arrangements with" the "endorsed" claimant and her counsel "as are deemed reasonable and appropriate under the circumstances." TDP § 5.2(c)(5).[18] At least in the short

---

**15.** Counsel for the Asbestos Claimants' Committee acknowledged in oral argument that it would be open to a claimant to do this, and that the trustee could elect to make the matrix-based payment without getting a full release from the claimant, even before the termination of the lawsuit.

**16.** The TDP express this in obverse fashion, by referring to the amount of the judgment less "Non–Compensatory Damages." The latter are defined under § 1.88 of the plan as

damages "that are penal in nature," including punitive damages.

**17.** The TDP's mechanism for this result is the subordination of the balance of such a judgment-derived claim to the initial payment in full of all other "Direct" asbestos-related claims pending then or to be brought in the future. TDP § 5.2(b).

**18.** The meaning of this language is not clear. It may permit an "arrangement" under which

term, that amount of the claimant's in-hand receipt under such an "arrangement" could be no greater than the "gross insurance proceeds recovered for the Trust" in consequence of the judgment. TDP § 5.2(c)(7). The balance of the amount of the judgment apparently would give rise to a claim against the trust, which would be subordinated to the initial payment in full of all other current and future Direct "asbestos-related claims." *Id.*

In turn, the actual amount payable by an insurer or insurers that were liable in indemnification in consequence of the entry of judgment on a litigated claim, "endorsed" or not, would be "recovered by the trust" in its own right.[19] The trustee then would administer those monies "for the benefit of ... *all* holders" of asbestos-related personal injury claims against the Debtor. Plan § 5.4(c) (emphasis added).

The trustee is empowered to adjust the current fraction on which he is to make payment on claims payable by the trust, at any time. TDP §§ 4.3 and 5.1(h).

Finally, the plan provides for two injunctions consequent to confirmation and the grant of discharge to the Debtor. The first would "channel all Asbestos Claims to the [t]rust." Plan § 7.2. The second would enjoin all entities holding asbestos-related claims, "Direct" or "Indirect," from asserting against certain third parties any claims that legally derive from their asbestos-related claims against the Debtor. Plan §§ 7.3(a)—(c). Those protected third parties include the Debtor's parent company and other related parties, certain participants in this case, and any insurance company that has settled with the Debtor on insurance coverage issues and has received this Court's approval of the settlement.

### MATTER AT BAR

Pursuant to the case procedures order, seven of the insurers filed initial statements of their objections to the confirmation of the Debtor's original plan between January 27 and February 23, 2005. Between those documents and their opening briefs, the insurers raised a total of 83 objections.

The Debtor's counsel and the other plan supporters revised various provisions of the original plan, and submitted the "First Amended" plan[20] in an attempt to meet many of these objections. For the oral argument on this motion, the Debtor's counsel organized the welter of insurers' positions, arguments, and accusations into four groups.[21] Within the four groupings,

---

the successful "endorsed" claimant would receive monies back from the trust in an amount substantially greater than the matrix-calculated distribution. Though there is at least a superficial tension with the provision that makes all received insurance proceeds property of the trust, this sort of arrangement certainly would be an incentive to those individual claimants whose counsel were willing to tackle unsettled coverage issues.

19. This overrides the *de facto* result under nonbankruptcy law and procedure, in which the claimant-plaintiff ultimately receives the benefit of an insurer's duty to indemnify, up to the amount of the judgment and subject to any intermediate cap imposed by the amount and scope of insurance coverage.

20. In the interests of precision, this document will be termed the "modified plan." Under the Code, the verb "to modify" identifies the process of changing a previously-submitted plan via the submission of a new version. 11 U.S.C. §§ 1127(a)-(b); Fed. R. Bankr.P. 3015(c) and (g).

21. The Debtor moved for summary judgment as to a number of other, more scattered issues, on which various insurers opposed it. The rulings on those more discrete matters are the subject of a separate order, entered today. Also, there is a final group of issues, those on which the Debtor does not seek rulings "as a matter of law" at this time. Those will be addressed on evidence to be submitted at a later hearing.

most of the individual objections coincide or substantially overlap. The Debtor's counsel and the plan supporters argue that all, or almost all, of these objections can be resolved now. They maintain that legal rulings can be made on these matters from the face of the modified plan and, if necessary, from certain facts that have not been controverted. The first two groups of issues entail heavier substantive legal argument. Their outcomes will significantly affect the way this case goes forward.

To present the issues they had raised in the first instance, none of the insurers' counsel suggested any other system-let alone a better one. Thus, the treatment will follow the sequence proffered by the Debtor's counsel.

For its substantive presentation, the Debtor divided the four groups of issues into two sequences. On one, it conceded the insurers' right to object to confirmation, and launched into the merits. On the other three, it argued that the insurers lack standing to object.

The objections in the first group all concern the proposed assignment of the Debtor's insurance rights to the trust and the effects, if any, that the assignment of liability to the trust and the proposed treatment of claims would have on the insurers' pre-petition rights and status under contract. To meet these objections, the Debtor proffered various provisions of its modified plan, and argued that they satisfied them.

The remaining groups of objections went to other provisions of the plan or to various aspects of its consummation. As to them, the Debtor posited that the insurers had no interest cognizable under law that would be affected by these provisions or their performance. Thus, the Debtor argued, the insurers lacked standing to be heard in objection to confirmation as to these provisions. If the Debtor's counsel

are correct, the objections in this group would be overruled, the Debtor's arguments adopted by the court, and the proffered rulings made. This would remove the underlying issues from play in the remaining proceedings on confirmation.

## DISCUSSION

### I. Insurance–Related Issues Under Plan.

#### A. Introduction.

Across the board, the insurers oppose the Debtor's proposals to transfer its current rights as an insured, if any, to the trust, and to have the trust then assert any remaining right to obtain defense and indemnification from the insurers when it administers asbestos-related personal injury claims.

The insurers argue that the mere act of assignment would violate contract and law. Beyond that, they insist that the trustee's assumption and exercise of the Debtor's benefits under insurance policies could grossly infringe on their contractual rights to control the defense and settlement of claims. This, they argue, creates a near certainty of severe financial prejudice to them, were the trustee later to demand indemnification tracing back to the amounts that the trust had paid to the claimants pursuant to the TDP. Finally, the insurers insist that confirmation of a plan that contemplates indemnification by them would seriously jeopardize their substantive position in the coverage litigation. They argue that the Debtor's proposal would give the Debtor and the trust a basis to argue that the confirmed plan's terms preclude the insurers from denying coverage, which would enable a grant of summary judgment adverse to the insur-

ers in the coverage litigation.[22]

In counter to these accusations, the Debtor and its supporters have insisted from the inception of this case that their intent is to propose a plan that leaves all of the incidents of the relationship of insurer and insured in place post-confirmation, but for the assignment to the trust. The Debtor maintains that the trust's structure, rights, and long-term operations do not presuppose the availability of insurance coverage. More to the point of the insurers' objections, the Debtor and its supporters insist that the confirmation of a plan in this case should and would not operate as an adjudication of any point of fact or law that would go to the issue of coverage. Finally, they assert, even though the plan contemplates recourse being taken against insurers on any adjudicated liability coverage, the plan preserves all of the insurers' pre-petition latitude to defend any claim tendered under that coverage, on its full merits.

### B. How the Plan Would Work, as the Debtor Represents It.

At this point, the discussion is best advanced by recapitulating the statements that the Debtor and its supporters have made, as to how they intend the plan to work in its initial consummation. To fully confront the insurers' objections, one then must recognize the necessary implications as to how the trust must implement the plan's provisions, and the substantive consequences of that for all parties.

The question is, how the establishment of the trust and the trust's performance under the Trust Distribution Procedures would relate to the insurers' interests—and how, if at all, those post-confirmation processes would affect the pecuniary interests or non-pecuniary rights that the insurers had under their pre-petition contractual relationships with the Debtor.

The following is the way that the Debtor and its supporters say that things would work after confirmation of the plan.

On its face, the plan deigns not to affect "the right of any Asbestos Insurance Companies under any Asbestos In–Place Coverage." All such insurers "shall be deemed to have reserved all rights . . . to contest or defend any claims against them on the merits of such claim to the extent permitted under applicable non-bankruptcy law." Plan at § 5.7. This, according to the plan's supporters, is the bedrock principle for the plan's effect on the insurers' rights and obligations as putative indemnitors.

As the plan's supporters see it, in the majority of individual cases the "estimation" of claims under the Trust Distribution Procedures and the payment of the amounts provided by their matrix would go forward, using monies in trust, without regard to the availability of insurance.[23]

---

**22.** With great bombast, GAIC's counsel went beyond the abstract in this argument; he accused the Debtor and its supporters of a specific, crafted, malign strategy to do just that in the coverage litigation, even after their assurances to this Court that they had no intention of doing so. To support this indictment, he pointed to the experience of different insurers with a different debtor, in a past bankruptcy case, in a different forum, and insisted that the Debtor, the trust, and their allies would do the very same thing, despite any disclaimer they were now making to this Court. (The experience in that other case was reported in electronic format in *In re Fuller–Austin Insulation*, 1998 WL 812388, 1998 U.S. Dist. LEXIS 18340 (D.Del. Nov. 10, 1998) and *Fuller–Austin Insulation Co. v. Fireman's Fund Ins. Co.*, 2002 WL 31005090 (Cal.Super.Ct., Aug. 6, 2002).)

**23.** The Debtor and the Asbestos Claimants' Committee have represented this through remarks made by their counsel at various hearings during the case.

To the extent that any insurers' dollars were used to make payments on these claims through the trust, it would be with the consent of those insurers who had paid into the trust; such monies would only trace back to lump sums paid by them in settlement, for the benefit of the channeling injunction. As an immediate matter, then, none of the insurers would be *forced* to use their money to make payments to claimants under the matrix and through the trust.[24]

The Debtor and its supporters insist that this "estimation" and payment of claims would not bind any party, in particular any non-settling insurer, to the existence and amount of a claim that would be subject to indemnification under liability insurance coverage merely because the trust had paid it. The trustee would be empowered and fully able to "estimate" a submitted claim; to obtain a full release from the claimant; to pay the claim as estimated; and then be done with it forever, without tender to an insurer at any time. In that instance, the disbursement to the claimant would be entirely on the nickel of the trust, from monies deposited by the Debtor, its parent, and settling insurers, or from the residue of recoveries from liable insurers after a suing claimant had received a partial distribution from the trust.[25] The pecuniary interests of non-settling insurers would not be implicated

before they had had full due process in the coverage litigation and before the trust's tender of the claim in due course. Hence, the Debtor insists, such insurers' contractual interests to supervise and control the processes of settlement and litigation would not be defeated by the trust's separate transaction with a claimant.

On their face, the plan and the Trust Distribution Procedures do reserve to the trustee a right to tender any claim to a non-settling insurer, for indemnification and for defense in any litigation that would result.[26] As the Debtor would have it, upon such a tender, any past performance by the trust in estimation and payment on the subject claim would be irrelevant to the subject insurer. The insurer would have full latitude to choose among denying coverage (had it not already been adjudicated), assuming the defense under a reservation of rights (again, had coverage not already been adjudicated), or defending the claim on its merits on any ground including lack of injury, lack of liability for any injury, and amount of damages.

Again, according to the Debtor's view, if the claimant were ultimately successful in prosecuting the claim through litigation, but before the coverage litigation was resolved, the trust could make a claim for indemnification after making distribution to the claimant and receiving a full release.

---

**24.** If this is so, it would give the lie to the broad-brushed, conclusory accusation made by some of the insurers' counsel, repeatedly and in florid fashion, that "their clients' money" would fund the plan and the trust, over their undying objections.

**25.** The obvious motivation for such a strategy would be to settle and get rid of as many small claims as possible, given the possibility that transactional costs to pursue indemnity would be excessive compared to the amount disbursed. In good conscience, the insurers cannot deny the merits of such a strategy. Outside the arena of bankruptcy, they pur-

sued something like that themselves, before they announced that they were done with the Debtor. *See* n. 22, *supra.* In pursuing such a cutting-of-losses, of course, the trustee would have to consider whether the trust had enough assets left to service future claims.

**26.** Clearly, the trust would be legally warranted in making such a tender if the Debtor and the trust had already prevailed against that insurer in the coverage litigation. It would not be out of bounds in doing so if the coverage litigation were still pending without a final determination of no coverage.

In that case, however, the trust would still have to prove liability and the amount of damages, fully in accordance with applicable nonbankruptcy law, to the satisfaction of the insurer or a court, in order to recover against the insurer. Claimants would have recourse against the trust only to the extent of the amounts identified by the matrix, or pursuant to the plan's and the TDP's provisions for claimant litigation. They could receive an actual recovery from the trust in excess of the matrix amount only if the Debtor had a right of indemnification under duly-adjudged liability insurance coverage, and only after the claimant's success in litigation. In that instance, insurers would have a duty to make the trust whole for any amounts paid to the claimant, and beyond that up to the amount of judgment in favor of the claimant, subject to the adjudicated aggregate amount of coverage. The trust would receive this only upon full proof of the Debtor's liability and the claimant's damages, as if the Debtor had never gone through Chapter 11.

As the plan and related documents specify, if this were to transpire before the conclusion of the coverage litigation, while the insurers were still denying coverage, the trust would reserve its rights to settle with the claimant on the issues of liability and damages, with an assignment of all rights of indemnification, under *Miller v. Shugart*, 316 N.W.2d 729 (Minn.1982). In such case, the parties would be wholly subject to the principles of *Miller v. Shugart* and its progeny. In particular, in the event of a ruling on coverage adverse to them, the insurers would have all of the protections and all of the exposure that this line of Minnesota law provides to them. This would have been the case outside of bankruptcy as well. For that outcome, the insurers' accusation that the trust has a grossly-compromised position just does not wash. The trust would have

no more or less motivation to cave to any claimant on the amount of damages than any other putative insured would have under the same circumstances; the insurers would have the same latitude to raise the defense of collusion that they would have had, had the trust not been substituted for the Debtor in the situation.

The logical implication of this is that the possible avenues for the claimant and the possible vectors for the trust would be two-fold, if a claim with an apparent measure of damages far in excess of the matrix amount were to be presented after the end of the coverage litigation. They would depend on the outcome of the coverage litigation. In either instance, insurers would have protections, rights, and duties no more or less than they had pre-petition. If the Debtor (or, at that time, the trust) lacked coverage, the claimant would be relegated to an in-hand realization in the matrix amount—and, in turn, would be subject to the trust's ability to pay and the trustee's discretion in disbursement. If coverage had been established, the trustee could then tender the claim to the insurer(s), with the defense of the claim then subject to all the control that the insurers would enjoy under contract in consequence of their adjudicated duty to indemnify.

And, as a final implication, under the last such permutation, if the trustee had already disbursed to the claimant pursuant to the TDP, it could seek indemnity from an insurer with a coverage obligation, subject to all limitations under the applicable policies, just as an insured could for anything it would have paid out of its own pocket in corollary circumstances but outside of bankruptcy.

*C. Whether the Terms of the Plan Would Actually do What the Debtor Says They Will.*

Getting down to the brass tacks of this case, however, the question is whether the

specific provisions of the plan and the TDP actually do effect all of this, structurally and legally. At this point, discussion of the specific objections in the "insurance issues" group is warranted. The question is whether the language challenged under each such objection actually mandates the processes just summarized, individually and in consort. The insurers argue that the implementation of the plan would sunder duties of the Debtor or rights of the insurers in four major ways. The Debtor structured its motion to respond to each such point. Then it layered on a more generic argument to boot, for prophylactic effect.

The following are the rulings on these specific objections.

### 1. Plan's Effect on "No–Action" Clauses.

■ For the motion at bar, the parties assume that all of the applicable liability insurance policies have "no-action" clauses-that is, provisions that bar the Debtor, as insured, from taking any action in connection with a pending or potential claim that would affect the fixing of liability or the liquidation of the amount of the claim in any way, without the knowledge and consent of the insurer. The purpose of these provisions is patent, and not unreasonable. Because insurers, as indemnitors, are ultimately "on the hook" for an insured's liability to a claimant, they have a justifiable expectation to be informed of and to participate in all activity that could affect the

fixing and liquidation of an insured's liability to the claimant.

The objecting insurers argue that the administrative structure and operation of the trust violate such "no-action" provisions, because they result in a disbursement of payment on account of asbestos-related claims against the Debtor that otherwise would be subject to the insurers' direct duty of indemnification.

The insurers' ultimate concern over this point is not articulated in detail, or with crystal-clarity. However, it is clear that they fear collateral consequences from the trust's administration. The thought is that any acknowledgment (by the Debtor or by the trust) of a duty to make a claimant whole, by the processing of a claim under the medical categories and matrix and its payment under the TDP, could lead to some sort of automatic financial recourse against any insurer that had a duty to indemnify the Debtor, via an assertion of the preclusion doctrines in a subsequent "direct action" lawsuit or other litigation or through some other legal theory.

This fear, however, is not founded. The various terms of the plan that establish the trust and govern its operation explicitly bar the Debtor, the trust, and all others bound by the confirmed plan from asserting issue or claim preclusion, waiver, estoppel, consent, or any other legal or equitable theory in any way in the future, as to the existence, enforceability, or amount of a claim for damages by a claimant who receives a distribution under the TDP. *See* Plan §§ 5.4(e),[27] 5.4(d),[28] and 5.4(f).[29] The

---

27. Section 5.4(e) provides:
The consensual estimation of claims for distribution purposes only by the Trust shall not be a finding or fixing of the amount of any Asbestos Claim with any binding legal effect other than for distribution purposes by the Trust under circumstances where a claim is not further pursued in the state or federal court system, with the result that any amount so estimated for distribution

purposes will not have any res judicata or collateral estoppel effect for any other purpose and shall not constitute a binding determination on any issue or the creation of a liquidated non-bankruptcy claim.

28. Section 5.4(d) expressly preserves the vitality of "no action" clauses in pre-petition policies:

trust's administration of any particular claim is termed an "estimation ... solely for distribution purposes by the [t]rust." 11 U.S.C. § 502(c)(1) expressly allows for the estimation "for the purpose of allowance ... [of] any contingent or unliquidated claim the fixing or liquidation of which ... would unduly delay the administration of the case." The use of this whole process to promote a prompt distribution of funds in the trust dovetails perfectly well with the structure and function of this sort of trust, as contemplated by 11 U.S.C. § 524(g)(2)(B).[30]

More to the point of the objection at bar, the completed administration of a particular claim would have binding effect only between the claimant and the trust, and only as to the claimant's rights as defined under the matrix. Some courts hold that the estimation of a claim under § 502(c)(1) has binding effect *per se* only for the administration of claims and assets in a bankruptcy case, and, does not give rise to a fixed and liquidated claim cognizable in any other forum. *E.g., In re Eagle Bus Mfg., Inc.,* 158 B.R. 421, 437–438 (S.D.Tex. 1993); *In re Teigen,* 228 B.R. 720, 722 (Bankr.D.S.D.1998); *Matter of Interco Inc.,* 137 B.R. 993, 999 (Bankr.E.D.Mo. 1992). Others have envisioned an estimation under § 502(c)(1) as having preclusive effect, but have recognized the bankruptcy court's power to limit or deny that effect in deference to another forum, at the instance of party or parties, or not. *In re Indian Motocycle Co., Inc.,* 261 B.R. 800, 808 (1st Cir. BAP 2001); *In re Handy & Harman Refining Group, Inc.,* 262 B.R. 211, 215–216 (Bankr.D.Conn.2001).

Whichever line of authority applies, at bare minimum this Court has the power to

The non-binding estimation provisions of this Plan shall have no effect upon any "no action" provisions contained in any applicable Asbestos Insurance Policy to the extent any such provision remains enforceable by an Asbestos Insurance Company under applicable non-bankruptcy law, with the result that, to the extent any such "no action" provision remains enforceable by an Asbestos Insurance Company, such Asbestos Insurance Company shall have no liability to the Debtor or the Trust with respect to any Asbestos Claim until entry of judgment by a court of competent jurisdiction or written settlement agreement approved by such insurer. Moreover, to the extent an Asbestos Insurance Company as a result of its prior actions and inactions continues to hold such rights as a matter of applicable non-bankruptcy law, it shall retain the full benefit of any policy provision that requires the estimation of an underlying coverage limit, the right to associate with the insured in defense and control of any claim proceeding, and the right to appeal as may be contained in any applicable Asbestos Insurance Policy.

29. Section 5.4(f), the plan provides:
The estimation for distribution purposes only as provided in Paragraph 5.4(e) shall be wholly without prejudice to any and all rights of the parties in all other contexts or forums and shall not be deemed to be a triggering event for liability under any Asbestos Insurance Policy.

30. In pertinent part, this provision requires, as the prerequisite for the issuance of the post-confirmation "channeling injunction" of § 524(g)(1)(A)-(B), that

(I) the injunction is to be implemented in connection with a trust that, pursuant to the plan of reorganization—
(I) is to assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products;
(II) is to be funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends ...
... and
(IV) is to use its assets to pay claims and demands ...

deny preclusive effect to the ostensible determinations that are to be made via the empowerment of the trust under the plan and TDP, and its exercise of that power via the estimation of claims. The confirmation of the Debtor's plan, with its cited §§ 5.4(e), 5.4(d), and 5.4(f), would act to do just that.

Thus, the assignment of monetary values to particular medical conditions that would be effected via the adoption of the matrix, and the recognition of and realization on a particular claimant's rights by estimation and payment pursuant to the TDP, are purely matters among the claimants, the Debtor, and then the trust. "Estimation" of a claim under the matrix is a process, and its payment under the TDP is an event, that take place in isolation insofar as any party other than the trust and the claimant. The Debtor is essentially waiving any right to invoke issue or claim preclusion against the insurers, based in any way on the trust's "estimation" of a claim. The trust, as successor to the Debtor, would be bound by that waiver post-confirmation. In turn, all asbestos claimants would be bound to the same waiver, or a corresponding bar, via the plan's confirmation. The trust could not go back to an insurer after completing an estimation, and have the right to receive payment of the amount paid to the claimant in estimation, just like that. An insurer could still raise the "no-action" clause to resist the demand as made. Further, if a claimant that had gone through estimation later asserted a larger claim subject to indemnification, the full amount of the claim, including any past payment by the trust, would be subject to all legal and procedural requirements prerequisite to the insurer's duty of indemnification, if any it had.

This responds fully to the objecting insurers' first insurance-related objection, which thus must be overruled.[31]

31. Though it is extraneous to the insurers' objections, one hitch lies in § 5.4(e). Phrased as it is, in somewhat clumsy language, it does not unequivocally validate and complement the other two sections. Of more concern, it is amenable to more than one construction. This provision is structured in light of the preclusion doctrines. The more abstract reference point logically broadens the class of affected parties to include the asbestos claimants. However, this single sentence is composed in run-on form; it incorporates too many thoughts. Its major structural problem is the placement of the phrase "under circumstances where a claim is not further pursued in the state or federal court system." It is unclear what this phrase is to modify: does it delimit a subset of asbestos claims, those on which the trust actually makes distribution, with the "binding legal effect" being that the satisfaction for the claimants in this subset is limited to a distribution from the trust? A logical consequence of this construction would be that these claimants would have no right of suit once they received their distribution from the trust, whether they give a release upon "estimation" or not. This result, however, does not fit into the structure described by counsel for the Committee at oral argument, summarized earlier, in which a claimant could participate in "estimation" and still pursue litigation with or without the endorsement of the trustee. (At oral argument, the Committee's counsel described the phrase as "descriptive but limiting." This syntactical characterization would partly resolve the problem, but it certainly does not scream out from the face of the plan's language.) Insofar as the insurers are concerned, however, the balance of the sentence settles their objection. Without reference to the identity of parties to be affected, it establishes that the trust's operation in "estimating" a claim "will not constitute a binding determination on any issue or the creation of a liquidated non-bankruptcy claim." Clearly, the trust and individual asbestos claimants could not take the fact of a completed "estimation" of a claim to another court, and there argue that the issue of the Debtor's liability under non-bankruptcy law, or any point of fact or law relevant to an insurer's duty to indemnify, had been settled in a binding way by the trust's act of "estimation." So we are left with an ambiguity in this one

### 2. Plan's Effect on Insurers' Rights with Regard to Handling of Claims.

■ For the motion at bar, the parties assume that all of the applicable insurance policies have "consent to settlement" clauses-that is, provisions that bar the Debtor from entering into the settlement of any claim as to which an insurer would have a duty of indemnification, without the insurer's consent to the terms of settlement. Such terms again are a justifiable incident of the insurers' general right to manage the processing of claims; they reflect insurers' understandable interest in containing their financial exposure under a policy. The objecting insurers argue that the processing and payment of claims through the trust would violate such provisions.

On a very elementary level, this objection stems from the fact that the insurers have no role in the administration of claims under the trust. The insurers would have an objection, were the Debtor proposing an "involuntary" funding of the trust by insurers or were the plan to leave room for the trust or individual claimants to assert the preclusion doctrines against insurers in any subsequent litigation over coverage or liability.

They do not, however. The Debtor contemplates that, as an ultimate fallback, the trust will operate on its own accord, administering and paying claims from funding supplied by the Debtor, its parent, and settling insurers that would have ceded their right to control the settlement process to the trust in exchange for the benefits of the channeling injunction. In a

superficial light, with the imprecision of a layperson's definition, "estimation" under the plan might be tagged with the term "settlement"; like a resolution of civil litigation, it *could* involve a claimant's release of the trust, and a permanent laying-to-rest of all possible controversies over the Debtor's past liability. However, in itself and in isolation, a completed estimation would not implicate any non-settling insurer in its role as indemnitor. An insurer would not be liable in a pecuniary way solely as a consequence of the trust's payment to the claimant. The values assigned to the claimants' rights under the matrix are "solely for distribution purposes by the [t]rust," Plan § 5.4(e); estimation will have "no binding effect" for any other purpose or in any other forum, *id.*

By its very nature, the "consent-to-settlement" clause operates only when the pecuniary interests of an insurer, as indemnitor, are directly implicated by the actions of the insured. Under the plan, this would happen only where the claimant elected to sue, and then only where there was available insurance coverage. In that case, the lawsuit would proceed as it would have outside of bankruptcy, with the insurer(s) having the full benefit of the "consent-to-settlement" clause.[32] Clearly, were the claimant unsuccessful in such litigation for any reason, the trust would be without recourse against the insurer and would simply be out the funds previously paid to the claimant in "estimation."

The Debtor is well-put to note that the Bankruptcy Code expressly authorizes a trust administering asbestos-related claims

---

provision, § 5.4(e), which must be resolved in a further modification in order to settle the issue. But because there is no potential impact on insurers' interests in that, and the remainder of the sentence protects them from preclusive effect, § 5.4(e) is not objectionable on the insurers' account.

**32.** Section 5.4(f) of the plan expressly provides for this:

> ... each Asbestos Insurance Company shall be entitled to (a) consent to any settlement of the asserted claim in all other contexts ...

to "operate through mechanisms such as structural, periodic, or supplemental payments, pro rata distributions, [and] matrices," § 524(g)(2)(b)(ii)(V), and that such a trust is to be funded "in whole or in part" by a debtor's "obligation ... to make future payments ...," § 524(g)(2)(B)(i)(II). The Debtor and its parent are committing their present assets and future revenues to the basic funding of the plan, in substantial amounts that presumably are commensurate to their obligations under the requirements of 11 U.S.C. §§ 524(g) and 1129 and other governing law.[33] Nothing in § 524(g) bars the Debtor here from providing for additional funding to derive, in part, from a pre-existing asset in the nature of a right to indemnification that might be called upon in the future, consistently with its pre-petition incidents under contract and law, whatever they may be.[34]

Under this construction of the plan and TDP—the one that the Debtor urges, with its logical implications—the second insurance-related objection is without foundation as well, and must be overruled.

### 3. Plan's Effect on Debtor's Pre–Petition Duty to Cooperate with Insurers.

■ Under contract and law, insureds generally have a duty to cooperate with their insurers in the resolution of claims that are subject to coverage. The objecting insurers insist that the consummation of the plan would cause a breach of this duty, by transferring all liability for asbestos-related claims to the trust and then making that entity responsible for resolving them. The thought apparently is that the Debtor then would be utterly clear of the claims, with neither the duty nor an incentive to participate in any process of resolving claims that later would implicate the insurers' duty to indemnify. The insurers insist that this would leave them bearing a duty of defense without the ready and easy source of information, witnesses, and documents necessary to mount an adequate legal response to a claim.

Were the plan to provide for a bare transfer of the liability and nothing more, there would be some basis for this concern. Any insurer that might be on the hook for indemnity would understandably want the Debtor, as the principal source of evidence on a claim, to have both a duty and an incentive to be forthcoming with that evidence. "Cleansed" of asbestos-related liability as it would be by the transfer and the discharge, the Debtor arguably would have neither; the insurers' ability to mount an effective defense on any claim or in any action tendered to them could be impaired.

At §§ 5.4(f) and 5.4(b), however, the plan provides that the insurers "shall be entitled to ... the cooperation of the Debtor in defense of the claim in all other forums ...," and that "the Debtor shall not be relieved of its continuing duties, if any, under any Asbestos Insurance Policy, and shall continue to perform such duties as required by applicable law." It would be hard to frame a rejoinder to these objections any more succinctly than that. This language clearly and unequivocally imposes on the Debtor a duty of cooperation with the insurers that fully corresponds with the one that it had before its

---

**33.** The present motion does not implicate the sufficiency of the basic funding of the trust, and no ruling on the point is being made now. That will be a matter for the Debtor's proof at the evidentiary stage of the confirmation process.

**34.** If the Debtor had rights of indemnification pre-petition, as assets of the bankruptcy estate they are subject to the same limitations under contract and law as they were then. *In re Schauer*, 835 F.2d 1222, 1225 (8th Cir.1987).

bankruptcy filing.[35] Post-confirmation, the obligation will essentially be contractual in nature,[36] requiring the Debtor to continue to cooperate with and to assist the insurers, when any claim is pursued through any means other than "estimation" under the TDP and an insurer has a duty of defense on the claim. If necessary, this duty can be enforced through an action for specific performance. Thus, though the plan substitutes a successor-entity as the nominal "insured" under any liability coverage that the Debtor may still have, it fully preserves the insurers' expectancy of the Debtor's own availability and cooperation in responding to claims subject to indemnification. Because the plan does not alter insurers' rights in this regard, it is not objectionable on this theory.[37]

### 4. Confirmation as a Determinant of the Insurers' Outside Exposure.

 Several of the insurers argue that confirmation of the plan would have an inappropriate collateral effect, if the court made a finding on the total value of outstanding asbestos-related claims. The concern here apparently is that such a finding would be binding on the insurers in other forums, in some context and toward some end that is never identified with any great specificity.

As its counsel point out, the Debtor will have to produce evidence going to this point to meet one of its requirements for confirmation, that under § 524(g)(2)(B)(ii)(I).[38] Congress clearly

---

**35.** The Debtor's position in the Ramsey County coverage action is that its duty to cooperate with some of the insurers was terminated as a result of anticipatory breach and repudiation on the insurers' part. The Debtor acknowledges that this does not completely jibe with an unqualified commitment to do the insurers' bidding on matters of cooperation in the future. Nonetheless, the Debtor is correct as to the overall result: if it had a duty of cooperation when it commenced this case, it will continue to have one after the confirmation and consummation of the plan. The existence of that duty as to any particular insurer is a matter for adjudication by the Ramsey County District Court, and the Debtor will be bound by its rulings.

**36.** A confirmed reorganization plan under Chapter 11 is likened to a "new contract" among the debtor, its creditors, and all other parties in interest, the terms of which are fully enforceable at law and equity. *See In re A.P.I., Inc.*, 324 B.R. 761 (Bankr.D.Minn. 2005) (and cases cited therein).

**37.** GAIC's layering-on of a "lack of motivation to cooperate" argument was strictly a red herring, an insinuation not at all based on legal considerations. After the trust is interposed, the Debtor might not be as directly under the pressures of self-preservation to assist its insurers as it was pre-petition, but that is beside the point. The Debtor will still have an unequivocal legal duty to do so, and

the degree of its eagerness in complying will be irrelevant as long as it does. Its ongoing legal duty can be enforced, affirmatively through injunctive relief if necessary, and that is all that really matters.

**38.** The route to this requirement is quite involved. 11 U.S.C. § 524(g)(1)(A) authorizes the issuance of "an injunction ... to supplement the injunctive effect of a discharge," which is to "enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering, or receiving payment or recovery with respect to any claim or demand" that is to be paid in whole or in part, § 524(g)(1)(B), by a trust that assumes asbestos-related liabilities pursuant to a plan of reorganization. In turn, if certain findings are made, that injunction is protected from collateral attack or other review or interpretation in any forum other than the United States District Court in which the injunction was issued. § 524(g)(2)(A). Among those findings are that:

... (ii) subject to subsection (h), the court determines that—
(I) the debtor is likely to be subject to *substantial* future demands for payment arising out of the ... conduct or events that gave rise to the [asbestos-related] claims that are addressed by the injunction;
(II) the actual amounts, numbers, and timing of such future demands cannot be determined;

believed that this inquiry was necessary. It could not have countenanced the use of its results to prejudice the rights of any interested party.

Too, it is far from clear how some other forum would even deign to give preclusive effect to such a broad, vague finding.[39] Nonetheless, the Debtor now provides that "[a]ny evidence adduced as part of the Confirmation Hearing [as to this issue] and any findings of the Bankruptcy Court related to that evidence ... shall have no res judicata or collateral estoppel effect in any other context." Plan § 5.4(d).[40]

Strictly speaking, neither the Debtor nor this Court could dictate to another forum on its application of the preclusion doctrines. Nonetheless, this language will prohibit the Debtor and its successor(s) from engaging in the exploitation that the objecting insurers describe with dread; by forgoing the right to invoke claim or issue preclusion to lay the objections to rest, the Debtor is judicially estopping itself and its successor(s) from insisting on the benefits of those doctrines in a collateral proceeding. *New Hampshire v. Maine*, 532 U.S. 742, 749–751, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001).

Therefore, this theory of objection is countered as well, and must be overruled.

### 5. Plan's "Catch–All" Provisions.

After addressing these specific points of objection in its motion for summary judgment, the Debtor further underlined its intent not to affect the rights and duties that arise out of the insurer-insured relationship in any way relating to the duty of indemnification, and all of the antecedents and consequences to it under applicable nonbankruptcy law. To do so it cited several other provisions in the plan:

> To the extent an Asbestos Insurance Company as a result of its prior actions and inactions continues to hold such rights as a matter of applicable nonbankruptcy law, it shall retain the full benefit of any policy provision that requires the estimation of an underlying coverage limit, the right to associate with the insured in defense and control of any claim proceeding, and the right to appeal as may be contained in any applicable Asbestos Insurance Policy.

Plan § 5.4(d); and

> Each Asbestos Insurance Company shall be entitled to ... (c) manage the course of the litigation in all other forums, and (d) such rights as are provided under the terms of their respective Asbestos Insurance Policies as if the Asbestos Claim had never been estimated for distribution purposes in connection with

---

(III) pursuit of such demands outside the procedures prescribed by such plan is likely to threaten the plan's purpose to deal equitably with claims and future demands ...

11 U.S.C. § 524(g)(2)(B)(ii)(I-III) (emphasis added). The gauging of "substantial future demands for payment" on asbestos-related claims pursuant to § 524(g)(2)(B)(ii)(I) does not require a liquidation to the penny; in fact, the practical impossibility of this is recognized in § 524(g)(2)(B)(ii)(II). However, the gauging of substantiality requires the court to fix the outside total of potential claims via some rough valuation.

**39.** The feared preclusion would most likely bloom in coverage litigation. However, the

insurers did not detail any theory of law under which an "estimate" of the Debtor's outside personal liability, as a single undifferentiated figure, would translate into any direct jeopardy to the particular insurers' "pecuniary" rights and duties, at least insofar as adjudication in another forum is concerned and particularly as to any individual claim that would be subject to indemnification.

**40.** Under this section, the Debtor also specifies such evidence that "shall be solely for the purpose of establishing the requirements of Bankruptcy Code sections 524(g) and 1129 in connection with Confirmation ..."

the Reorganization Case, all to the extent, if any, provided under the respective terms of their policies and applicable non-bankruptcy law after taking into account an Asbestos Insurance Company's actions and inactions in respect to its duties and obligations under its policies.

Plan § 5.4(f). Subject to a carveout that shelters the Debtor's actions in seeking discharge,[41] the plan reiterates that the insurers will have all

> ... defenses, if any, that the insurers issuing the Asbestos Insurance Policies would be able to raise if the claim for coverage were being brought by API, excepting any defense (1) related to the revesting of such pre-petition contracts, or rights or proceeds thereunder, in the Trust in connection with or pursuant to this Plan, (2) that is effected by operation of bankruptcy law as a consequence of confirmation of the Plan, or (3) based on facts determined by the Bankruptcy Court in connection with confirmation of the Plan.

Plan § 5.4(I). And, finally, it provides

> Except as provided in any Asbestos Insurance Settlement Agreement and in Section 5.4 hereof, nothing in this Plan determines the right of any Asbestos Insurance Companies under any Asbestos In–Place Insurance Coverage, and all Asbestos Insurance Companies shall be deemed to have reserved all rights under any Asbestos Insurance Policy, Asbestos In–Place Insurance Coverage or Insurance Settlement Agreement to contest or defend any claims against them on the merits of such claim to the

extent permitted under applicable non-bankruptcy law.

As applied to the plan as a whole, these "catch-all" terms enhance the previously-discussed, more specific provisions. In the aggregate, they preserve the parity of rights, duties, and options that prevailed between the Debtor and non-settling insurers before the Debtor's bankruptcy filing, without entailing any adjudication as to the terms of that parity. When the trustee tenders a claim to an insurer for defense and indemnification, the insurer may respond to the claim, as between itself and the claimant, just as it could have outside of bankruptcy. To the extent that the coverage action remains unresolved at that point, the insurer may deny coverage if it believes it has the warrant to do so, declining to defend and indemnify (and taking the risks inherent in that posture under non-bankruptcy law). To the extent that the court in the coverage action has adjudicated a duty of defense and indemnification in the subject insurer, the insurer may carry forward in the process of the fixing and liquidation of that claim and may command the Debtor's cooperation, just as it would have outside bankruptcy.

The only change is that the insured party is substituted—i.e., the trust for the Debtor—and actual payment in the event of an adjudicated duty to indemnify for a particular claim is funneled elsewhere—i.e., to the trust for general administration rather than to the claimant or to the Debtor. Neither of these changes is objectionable. The Debtor is obligated to provide for the funding of the plan as a means of funding; the transfer to the trust of property rights like the insurance coverage is

---

**41.** This exception is found in Plan § 5.4(f):

The duties and obligations of each Asbestos Insurance Company under the Asbestos Insurance Policies shall not be impaired, altered, reduced or diminished by (1) the

discharge of all obligations and liabilities of the Debtor, (2) the assumption of responsibility and liability for all Asbestos Claims by the Trust, or (3) releases granted to Released Non–Debtor Parties under the Plan.

clearly contemplated by the statute; and the Debtor and the holders of asbestos-related claims are not to be penalized for the Debtor exercising those options. *In re Combustion Engr'g, Inc.*, 391 F.3d 190, 234 n. 45 (3d Cir.2004).

An insurer thus will not be able to deny coverage on the ground that the trust now holds the status of insured, and not the debtor with which the insurer was originally in contractual privity. To the extent that an insurer has an obligation of payment on account of the claim imposed on it, via litigation or settlement, it will discharge its duty of indemnification by paying the trust, with the claimant then bound to accepting his due pursuant to the plan and the TDP.

Thus, the plan does indeed preserve the insurers' full latitude to respond to any demand for payment in indemnification of the Debtor that they had before the Debtor's bankruptcy filing. The way in which the trust is constituted and funded simply does not impose any material change on the insurers' specific interests as indemnitors in any way, in their rights and duties under law or their policies. Neither do the bases on which the trust would make distribution on account of claims submitted to it.[42]

All told, the trust will operate and the TDPs will apply in just the way the Debtor argued by authorizing the initiation of both; confirmation will not alter any of the insurers' pre-petition rights or duties vis-a-vis the Debtor, or the trust as its successor. There is no basis for denying confirmation on any ground relating to this group of insurers' insurance-related concerns, and all such objections must be overruled.

## II. Standing

### A. Introduction

As to a second group of issues, the Debtor and its supporters argue that the insurers do not even have a right to object, i.e., that they lack standing to be heard on those issues. If this is correct, the court would not reach the substantive merits of these objections; it would be as if no party had objected, on those stated grounds, and the Debtor's plan could not be denied confirmation on the theories advanced under them.

The parties have framed up the larger issue with reference to function and rule, as follows: where a party to a Chapter 11 case is not a creditor to the debtor, may it object to all aspects of the debtor's plan and the debtor's showing for confirmation, or is it limited to those aspects that bear on its specific relationship to the debtor? This issue is hotly contested between the two sides, and it requires a general rule of decision right out of the gate. The threshold issue is, what source of law governs the insurers' standing to object to confirmation? The outcome of this will enable a more concrete resolution of the parties' contentions on the issue of standing.

### B. The Determinant of Standing in a Chapter 11 Case.

Put more specifically, with references to sources of law, the issue is: do 11 U.S.C. §§ 1109(b) and 1128(b) enable a non-creditor party to a Chapter 11 case to raise any issue in objection to confirmation, or is its standing to object limited by the constitutional and prudential considerations applicable to the federal courts generally?

This issue is of real moment in this case. In their preliminary statements of objection, the insurers went far beyond the

---

**42.** To make it utterly clear: all of this is a ruling that construes the plan, its structure and its operation.

provisions of the plan that touched on their own contractual relationships with the Debtor as their insured. They also argued that the plan should not be confirmed for numerous other reasons. The insurers argue, *inter alia,* that the plan, the matrix, and the TDP lack safeguards against the allowance and payment of unfounded or spurious claims; that the plan and the TDP unfairly discriminate between holders of asbestos-related claims currently being asserted, and those that would make claims in the future; that the Debtor has not addressed the possibility of augmenting the trust by the use of avoidance remedies and the infusion of any proceeds of avoidance into the trust; and that the structure for initially funding and securing the future funding of the trust does not comport with applicable law. Many of these issues are factually complex. However, no other party to the case has raised them in objection to confirmation. Their litigation and trial would consume very significant resources, and would delay the resolution of the Debtor's bid for reorganization.

The Debtor maintains that the insurers have no right to raise such objections. Its point is that in such respects the operation of the plan only affects the interests of *creditors,* i.e., holders of pre-petition claims against the Debtor, and the insurers are not such creditors.

The insurers, on the other hand, insist that in making these objections they are only exercising a very broad right to participate in this case, granted to them by 11 U.S.C. §§ 1109(b):

A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter[,]

and 1128(b): "A party in interest may object to confirmation of a plan."

The Debtor's rejoinder to this is that the insurers do not meet the broader constitutional and prudential requirements for being heard in the federal courts generally, which must be applied in addition to the two provisions from Chapter 11. Therefore, the Debtor argues, as a matter of the inherent limitations on the federal courts' power under Article III of the United States Constitution, the insurers may not be heard to object to confirmation on any aspect of the plan other than those just treated in this order and, perhaps, a few others.[43] In the jargon of federal-court jurisdiction, this is a matter of *standing.*

■ In a Chapter 11 case, the need to establish standing "is especially pronounced in the area of objections to plan confirmation." *In re Myers,* 168 B.R. 856, 862 (Bankr.D.Md.1994). In large part, this is so because a plan of reorganization enables a collective remedy for systemic financial failure, having simultaneous effect on multiple creditors and other parties in interest. *In re Dial Bus. Forms, Inc.,* 341 F.3d 738, 744 (8th Cir.2003); *Corbett v. MacDonald Moving Servs., Inc.,* 124 F.3d 82, 89 (2d Cir.1997).[44]

**43.** A separate order will address contested issues of narrower scope that were raised by the Debtor's motion. The Debtor has reserved still others for evidentiary development at a later, full-blown confirmation hearing.

**44.** To make it clear: the following discussion treats standing *in the Bankruptcy Court,* on the trial court level. The caselaw contains

some thoughtful discussions on standing *to appeal* from a bankruptcy judge's decision; some of the parties at bar have relied on these decisions in argument. *E.g., In re Combustion Enr'g, Inc.,* 391 F.3d at 214–224 (3d Cir.2004). Those courts have generally recognized that appellate standing in the bankruptcy context is subject to considerations

The interests of parties affected by the reorganization process will vary greatly. Those who are parties to executory contracts with a debtor may find themselves entirely out of an active relationship after confirmation, via the "deemed breach" of rejection under 11 U.S.C. § 365(d); they may have to forgo their own rights to terminate the contract for a past default if the debtor assumes under § 365(a) and the debtor proposes a cure adequate under § 365(b)(1); or they may just continue doing business as usual if there is no default and the debtor assumes. Confirmation's effect on creditors' pre-petition rights can go all the way from nothing—the so-called "unimpaired" claim, within the meaning of 11 U.S.C. § 1124—to very substantial reformulation and reduction of the rights and duties that obtained under pre-petition law and contract.

■ Of course, a party in interest should be heard on the specific substantive provisions of a plan that would change its pre-petition contractual or legal position in any way. Further, when such a party has a post-confirmation right to receive payment under the plan, and is therefore dependent on the debtor's post-confirmation resources or operations, it should be able to oppose the debtor's case on more general showings required for confirmation. Depending on the nature of the creditor's rights under the plan, it could object on the "best interests of creditors" requirement of 11 U.S.C. § 1129(a)(7)(A)(ii),[45] the feasibility requirement of 11 U.S.C. § 1129(a)(11),[46] or the "one friend" requirement of 11 U.S.C. § 1129(a)(10).[47]

The question of standing is most salient, where a creditor or party in interest claims that the plan violates governing law in its effect on the rights of a party other than the objector, or on the rights of a class of creditors or parties to which the objector does not belong. As the Debtor and its supporters characterize it, that is the situation here.

They are correct in that observation. This case does indeed bring the conundrum of standing right into focus; well-funded, very active, and aggressive parties to this case have raised a myriad of objections to confirmation, with many of them going to aspects of the plan that do not by their terms affect the legal or contractual basis of their relationships with the Debtor, or those parties' own options in those relationships. The question is whether those parties have the right under law to be heard on such matters.

---

different from those relevant to standing at the trial level. *Id.* at 215. Though the considerations look and "feel" similar, the parties that cited these cases for a standard here relied on authority that was largely inapposite.

45. The pertinent text of this provision is:

(7) With respect to each impaired class of claims or interests—
 (A) each holder of a claim or interest of such class—
 . . .
 (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive

or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . .

46. The pertinent text of this provision is:

Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

47. The pertinent text of this provision is:

If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

The threshold issue here is best treated by enunciating two component rulings, via summary pronouncements and the legal rationales that support them.

1. *To Object to Confirmation of a Plan of Reorganization, a Party to a Chapter 11 Case Must Prove Its Statutory Right to Participate in the Case Under 11 U.S.C. § 1109(b) and Must Satisfy the Requirements for Standing Under the Constitutional and Prudential Tests.*

Article I, Section 8 of the United States Constitution grants Congress the power to "establish ... uniform laws on the subject of bankruptcies ...." Congress exercised that power by enacting the substantive provisions of the Bankruptcy Code of 1978, 11 U.S.C. §§ 101 et seq. In turn, via the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333, Congress gave the United States District Court jurisdiction over "all cases under [the Bankruptcy Code]," 28 U.S.C. § 1334(a), and "all civil proceedings arising under [the Bankruptcy Code], or arising in or related to cases under [the Bankruptcy Code]," 28 U.S.C. § 1334(b). Ultimately, that jurisdiction is subject to Article III, Section 2 of the Constitution, with its threshold requirement that there be a "Case" under federal law or a "Controversy" between parties, before the federal judicial power may be invoked and applied. *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Committee*, 321 B.R. 147, 161 n. 5 (D.N.J.2005). To administer bankruptcy cases and proceedings within its jurisdiction, the United States District Court is authorized to "refer[ ] to the bankruptcy judges for the district," 28 U.S.C. § 157(a), who collectively "shall constitute a unit of the district court to be known as the bankruptcy court for that district," 28 U.S.C. § 151. In this district, that reference is accomplished by Loc. R. Bankr.P. (D.Minn.) 1070–1. Thus, in bankruptcy cases in this district, the jurisdiction of the district court is exercised in the first instance by bankruptcy judges, with the authority to enter a final order determined by the distinction between core and related proceedings, 28 U.S.C. §§ 157(b)-(c). In the last instance, however, the congressional grant of jurisdiction is clearly to the district court.

Given the fundamental structure of Article III, "[a] party invoking the jurisdiction of the federal courts must meet the constitutional requirements of Article III and the prudential limitations crafted by the courts." *United States v. United Sec. Sav. Bank*, 394 F.3d 564, 567 (8th Cir. 2004) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Injecting oneself into a Chapter 11 case and objecting to confirmation of a plan is certainly an invocation of the federal courts' jurisdiction over "a case under" the Bankruptcy Code and a proceeding "arising under" the Bankruptcy Code. It is a direct request to a federal court, through the presiding judicial officer, for an adjudication that will impact on the future rights, obligations, and options of parties to that case, to the extent that those have been put into play by a debtor's proposal for reorganization. Such a party must establish its standing to be heard under the bedrock principles that apply to *all* federal courts, as well as its statutory right to participate in the case under § 1109(b). *E.g., Matter of James Wilson Assoc.*, 965 F.2d 160, 169 (7th Cir. 1992); *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. at 160. And, that party must satisfy all of the constitutional and prudential standing requirements, under a strict standard, as "an indispensable part" of its request for relief from a federal court. *Delorme v. United States*, 354 F.3d 810, 815 (8th Cir.

2004); *Johnson v. Missouri*, 142 F.3d 1087, 1088 (8th Cir.1998).

### 2. The Constitutional and Prudential Standing to Object to Confirmation of a Plan Must be Determined Separately as to Each Issue Raised by the Objection.

■ As noted earlier, the collective nature of reorganization gives special sensitivity to the issue of standing in proceedings on confirmation. *Supra* at pp. 854–55. A plan may encompass numerous separate treatments of the claims of individual and classified creditors alike, and noncreditor parties who may be bound to the debtor for duties of performance under pre-petition contract or law. Those treatments have individualized effects on their targeted constituencies' rights. *See* 11 U.S.C. § 1122(a) (requiring all claims or interests within a class to be "substantially similar to the other claims or interests of such class") and § 1123(a)(4) (requiring plan to "provide the same treatment for each claim or interest of a particular class," absent agreement by individual claimant or interest-holder to "a less favorable treatment"). Though Chapter 11 enables a coordinated, collective presentation of such treatments, the individual components resemble, in result, a reformation of the contractual or legal relationship between the debtor and each single treated party or constituency. *In re A.P.I. Inc.*, 324 B.R. at 768 ("In function and result, the rewriting of contractual obligations otherwise enforceable at law, the confirmation of a plan most resembles the traditional remedy of reformation of contract."). The provision for treatment of each class of creditors or each party in interest resolves a single legal dispute, actual or potential, over a discrete relationship.

■ The coordinated-but-patchwork structure of a plan thus merits, and even mandates, analyzing the standing of an objector by its specific stake in each issue that it raises. *In re River Bend–Oxford Assoc.*, 114 B.R. 111–113 (Bankr.D.Md. 1990). "An entity may be [a] real party in interest and have standing in one respect while he [sic] may lack standing in another respect." *In re Ofty Corp.*, 44 B.R. 479, 481 (Bankr.D.Del.1984). *See also In re Combustion Engr'g, Inc.*, 391 F.3d at 215 (citing *Lewis v. Casey*, 518 U.S. 343, 358 n. 6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *Int'l Primate Prot. League v. Admin. of Tulane Educ. Fund*, 500 U.S. 72, 77, 111 S.Ct. 1700, 114 L.Ed.2d 134 (1991)); and *In re Rimsat, Ltd.*, 193 B.R. 499, 503 (Bankr.N.D.Ind.1996).[48]

■ This conclusion dovetails with the one just made. The insurers' standing to object must be determined on a particularized basis as to each theory they have raised in opposition to confirmation. *In re Combustion Engr'g, Inc.*, 391 F.3d at 220 n. 28.

### C. General Principles of Constitutional and Prudential Standing

Over several decades of jurisprudence, the Supreme Court has formulated a two-component test to enable the federal courts to determine the standing of complainants before them. Such parties must demonstrate both constitutional and prudential standing. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Valley Forge Christian College*

---

**48.** In a variant way, the text of the Bankruptcy Code itself requires one particularized determination of standing, despite the breadth of §§ 1109 and 1128(b). It generally denies standing to object to confirmation when a plan does not impair a particular creditor's claim. 11 U.S.C. § 1126(f); *In re Orlando Investors, L.P.*, 103 B.R. 593, 596 (Bankr. E.D.Pa.1989); *In re Wonder Corp. of America*, 70 B.R. 1018, 1023 (Bankr.D.Conn.1987).

*v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 475, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

■ The constitutional "minimum" for standing flows from the requirement of Article III that there be a "case or controversy" to support the exercise of the federal judicial power. *Lujan v. Defenders of Wildlife,* 504 U.S. at 560, 112 S.Ct. 2130. "To meet the requirement of constitutional standing, [a party] must show that it has suffered an 'injury in fact' that is: concrete and particularized and actual or imminent; fairly traceable to the challenged action of the [opposing party]; and likely to be redressed by a favorable decision." *United States v. United Sec. Sav. Bank,* 394 F.3d at 567 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. at 560–561, 112 S.Ct. 2130); *International Ass'n of Firefighters of St. Louis, Franklin and Jefferson Counties, Local 2665 v. City of Ferguson,* 283 F.3d 969, 973 (8th Cir.2002). The party must have "such *a personal stake* in the outcome of the controversy as to assure ... concrete adverseness." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (emphasis added). The injury-in-fact must be palpable, though this requirement is not onerous. *Nat'l Wildlife Fed'n v. Agric. Stabilization & Conservation Serv.,* 901 F.2d 673, 677 (8th Cir.1990) (an "identifiable trifle" of injury will qualify as an injury-in-fact; quoting *United States v. SCRAP,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)). The injury need not be current; even a "threatened" injury will suffice. *International Ass'n of*

*Firefighters v. City of Ferguson,* 283 F.3d at 973.

■ Once a party has met these constitutional requirements, its standing may yet be challenged on three "prudential" grounds. *Friends of the Boundary Waters Wilderness v. Dombeck,* 164 F.3d 1115, 1125 (8th Cir.1999). These considerations are "closely related to Art. III concerns but [are] essentially matters of judicial self-governance ..." *Warth v. Seldin,* 422 U.S. at 499, 95 S.Ct. 2197. A complainant's bid for standing may be defeated if: (a) it is asserting a third party's rights; (b) it alleges a generalized grievance rather than an injury particular to it; or (c) it asserts an injury outside the zone of interest the statute was designed to protect. *Valley Forge Christian College,* 454 U.S. at 474, 102 S.Ct. 752; *Warth v. Seldin,* 422 U.S. at 499, 95 S.Ct. 2197.[49]

■ As to the first prudential consideration of standing, it is open to Congress to "extend standing to the outermost limits of Article III," by enacting legislation to enable a party "to bring suit for a statutory violation even if one normally would not think of that person as an intended beneficiary of the statute; or ... to seek relief based on the legal rights of individuals other than himself." *Oti Kaga, Inc. v. South Dakota Housing Dev. Auth.,* 342 F.3d 871, 880–881 (8th Cir.2003) (citing *Kyles v. J.K. Guardian Sec. Servs., Inc.,* 222 F.3d 289, 294 (7th Cir.2000)). However, even in such instances the individual so empowered still must "suffer[ ] an injury-in-fact ..." *Id.* "In no event, however, may

---

**49.** As the Supreme Court has framed the considerations for prudential standing, they do not seem to be independent elements that a party must prove, in its own right and in the first instance, as a prerequisite to seeking relief from a federal court. Rather, it appears, they are bases for unseating a party that is seeking relief by alleging a violation of law that results by chain of logic in some sort

of injury that arguably meets Article III minima, but whose personal connection with that injury is more attenuated and diffuse. Framed as they are, the considerations for prudential standing are more to be raised in the first place by an opponent. They would seem to shift the burden of proving an affirmative back to the party whose standing is put in question.

Congress abrogate the Article III minima: a plaintiff must *always* have suffered a distinct and palpable injury *to himself,* [*Warth v. Seldin,* 422 U.S. at 501, 95 S.Ct. 2197], that is likely to be redressed if the requested relief is to be granted." *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979) (emphasis added). The party in question "generally must assert his own legal rights and interests, and cannot generally rest his claim for relief on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. at 499, 95 S.Ct. 2197.

■ The second prudential limitation on standing precludes the assertion of "a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens." *Warth v. Seldin,* 422 U.S. at 499, 95 S.Ct. 2197. The reasons for this one resonate with the constitutional division of powers and with the American sense of limitations on the powers of governmental institutions; without the prudential restraint on according standing in cases where the claim to injury is so attenuated,

> the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights.

*Warth v. Seldin,* 422 U.S. at 499–500, 95 S.Ct. 2197.

■ The final inquiry under prudential considerations is whether the interest asserted by party in question falls within the "zone of interests" protected by the applicable law, whether constitutional or statutory. *Friends of the Boundary Waters Wilderness v. Dombeck,* 164 F.3d at 1125 (citing *Bennett v. Spear,* 520 U.S. 154, 164, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997)).

Though, as noted earlier, Congress may expand a zone of interests to the full extent permitted under Article III, *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 209, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972), the nature of the subject party's asserted interest must still fall within the class favored by the exercise of congressional power, as defined in the statute.

*D. Relationship Between the Statutory Authority for Participation in a Chapter 11 Case and the Doctrines of Constitutional and Prudential Standing*

■ The insurers maintain that, as parties in interest in this case, they have the right under § 1109(b) to be heard "on any issue." Therefore, as they would have it, they enjoy the right to object to any provision of the Debtor's plan or any aspect of its proposed reorganization, on any substantive ground whatsoever, whether the provision or aspect would affect them in the consummation or not. On that stand, they have mustered a large and wide-ranging battery of objections to confirmation. None of the insurers' counsel have overtly acknowledged that this position, as an absolute, is tenable only if § 1109(b) trumps the doctrines of constitutional and prudential standing. However, in light of the earlier discussion, that is the only way to get there. This does not work.

Setting that aside, though, there is one other avenue suggested by the insurers' argument: the possibility that § 1109(b) dovetails with the theory of prudential standing, and that its enactment vested parties like them with standing to invoke statutory provisions and to challenge terms of a plan that do not implicate the type of pre-petition legal relationship that they had with the Debtor. The insurers do not develop this thought in any great

detail. However, they suggest that Congress intended to enable participation of the sort that they want to pursue: an ability to challenge confirmation on any aspect of a plan, or any extrinsic showing that a debtor might have to make to obtain confirmation, even those that would have no legal or financial effect on the objector after confirmation.[50]

Unfortunately for this argument, the Supreme Court held in *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000), that § 1109(b) did not vitiate the prudential standing doctrine. In that case, it ruled that it did "not read section 1109(b)'s general provision of a right to be heard as broadly allowing a creditor to pursue substantive remedies that other Code provisions make available only to other specific parties." 530 U.S. at 8, 120 S.Ct. 1942.

Given that, § 1109(b) cannot be considered one of those congressional attempts to stretch standing out to the boundaries of Article III.[51]

█ Thus, even if the insurers got beyond the "injury-in-fact" requirement of constitutional standing, they would be defeased of standing under the first alternative of prudential standing doctrine. Congress did not intend to grant all parties in interest standing to be heard in confirmation proceedings on every single aspect of the reorganization proposal and the effects of its consummation. Further, given the want of an incipient injury to the insurers' interests from the consummation of plan provisions that impact only on creditors, the second alternative knocks them off the table for those arguments. The insurers' self-professed "right" to defeat confirmation by any basis whatsoever, simply because they oppose *other* aspects of the plan that do touch their contractual relationships with the Debtor, is nothing more than the "generalized grievance" that defeats prudential standing.

### E. Application

In the first section of this decision, the insurers' pre-petition relationships with the Debtor were discussed at length. Implementation of the plan would alter those relationships, the configurations of duties and rights, in only one corner of them: the trust would be substituted for the Debtor as the nominal insured, for the processing of all future claims as to which non-settling insurers had a duty of defense and indemnification. If an insurer believes that it no longer has a duty to defend and indemnify on account of such claims, it retains the benefit of all defenses to any assertion by the Debtor or the trust that it still has such a duty. If, however, an insurer does have the status of indemnitor, the trust and the Debtor alike would be bound to

---

**50.** Apparently, the thought behind this argument is that Congress wanted to ensure a breadth of input on the effects of confirmation, and to check the latitude in reorganization that an otherwise-unchallenged debtor might have, all in the service of "fundamental fairness." A sweeping pitch for "fundamental fairness" has been the insurers' clarion call throughout.

**51.** This makes every bit of sense against the backdrop of the modern cases that established the precepts of standing. The interests involved in a Chapter 11 case are the very private and particularized ones of commerce, finance, and employment. The fairly rare cases through which the courts have sheltered the legislated creation of such derivative standing involve much more fundamental issues of personal rights and liberties, in which there is a more substantial public interest—as, for example, a housing marketplace free of invidious discrimination, as was entailed in *Oti Kaga, Inc. v. South Dakota Housing Dev. Auth.*, 342 F.3d at 880–881 (citing *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d at 294).

the insurers, to support and assist them in the defense and administration of claims.

The threshold relationship between the Debtor and the insurers, in place before the Debtor filed for Chapter 11, is a rather narrow platform for participation in this case. In consequence, unless they have allowable claims as creditors against the Debtor on account of unpaid premiums or some other legal duty to pay, the insurers have standing to participate in this case only insofar as the plan touches on the relationship of indemnitor and indemnitee, under contract and applicable law.

This conclusion sets the stage for a discussion of specifics. The Debtor argues that the insurers lack standing as to five subsidiary groups of objections to confirmation.

### 1. Classification of Asbestos Claims in Class 3–B.

Under Class 3–B of the modified plan, liability for *all* "Asbestos Claims" against the Debtor is to be "assumed by and channeled to" the trust, there to be treated pursuant to the remaining provisions of the plan and the Trust Distribution Procedures. Plan § 3.5. "Asbestos Claim" is defined under Section 1.15 of the plan to include all asbestos-related personal injury claims that are or could be asserted against the Debtor "whether or not diagnosable or manifested before the Confirmation of the Plan or the close of the Reorganization Case."

Several insurers object to the way in which the Debtor has structured this classification.

However, with only one possible exception, the insurers are not claimants against the estate, and they certainly are not members of Class 3–B or any class that could be split off Class 3–B. Parties who do not hold asbestos-related personal injury claims or rights to payment that are derivative of such claims are not to receive anything from the monies that the Debtor and its parent are to deposit with the trust on and after the effective date of the plan. Insurers who are not claimants against the estate do not stand to receive a share of post-confirmation revenues or assets in consummation of a confirmed plan, no matter what the source of the distribution. As such, insurers are not in competition with the creditors in Class 3–B, at all. They have no stake or claim to the assets to be parceled out to the members of that class, as the plan defines them. Without such a stake or claim, the insurers have no standing to object to the Debtor's plan on any alleged infirmity of the classification under Section 3.5 of the plan.

One exception among the insurers may be CNA, which alleges that the Debtor owes it a sum of money on account of the premium arrangement under the terms of its policy, and that that debt arose pre-petition.[52] CNA is rather coy in the way it advances the existence of this claim. The Debtor did not schedule CNA as a creditor, and CNA has not yet filed a proof of claim in this case. However, through its submissions for this motion, CNA asserts a contractual and transactional basis for a pre-petition claim in its favor. From that, it dons a status of claimant,[53] asserting that this gives it

---

52. The arrangement is said to be one under which the amounts actually disbursed in indemnification or incurred as costs of defense are charged back against the Debtor, as "adjusted" or retroactively-assessed premiums.

53. The basis of the asserted status and claim is found in the March 18, 2005, Affidavit of Albert Hammond, a "legal collections specialist" for CNA, part of CNA's submissions for the "Legal Issues Hearing," docket no. 198. There is little detail in the assertion. The reason for CNA's coyness is rather patent.

standing to object to confirmation appropriate to that status.

■ Other terms of the Debtor's plan defeat CNA's argument, however. The Debtor maintains that CNA's claim would be classified as a general unsecured claim, and CNA does not gainsay that. Under Class 3–A, covering general unsecured claims, "holders of these claims shall receive full payment on the Effective Date." As such, these claims are not "impaired" by the plan. *See* 11 U.S.C. § 1124(1); *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197, 205 (3d Cir.2003) (noting that full payment of an "allowed claim" did not equate with an impairment); *Continental Securities Corp. v. Shenandoah Nursing Home P'ship*, 193 B.R. 769, 776 (W.D.Va. 1996) (noting that if the plan otherwise provides for the payment in full of the creditor's claim, then the creditor is not impaired under § 1124), *aff'd*, 104 F.3d 359 (4th Cir.1996). Holders of unimpaired claims lack standing to vote and to object to confirmation. 11 U.S.C. § 1126(f)[54]; *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d at 206–207.

Thus, all of the insurers lack standing to object to the way in which the Debtor has classified asbestos-related personal injury claims under its plan. Their objections in that regard are overruled, and the Debtor is entitled to the ruling it seeks under 11 U.S.C. §§ 1129(a)(7)-(8) and (10) on this issue.

### 2. Treatment of Asbestos Claims in Class 3–B.

■ Class 3–B provides a treatment for all asbestos-related claims that have been or could be made against the Debtor, seemingly under any theory of liability that could be advanced against the Debtor.[55] As noted earlier, this class includes both those claims in suit or otherwise asserted against the Debtor before its Chapter 11 filing, and all such claims as may be made in the future.

During the final stages of the negotiation of its plan, the Debtor had the proposed trustee review the asbestos-related personal injury claims asserted against it pre-petition on account of its "direct" liability, as to their qualification under the matrix and the Trust Distribution Procedures. Those claims that satisfied the pro-

CNA has doggedly asserted a right to jury trial in several proceedings in this case. In that light, *Langenkamp v. Culp*, 498 U.S. 42, 44–45, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990), very much speaks to its strategy on the matter of a pre-petition claim.

54. The language of this statute is:

Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

55. Just by way of illustration, the plan's definitions include those claims arising from exposure to asbestos products that the Debtor manufactured or otherwise handled in its own business activity. Plan § 1.15. Then they identify those claims "caused or allegedly caused by asbestos for which [the Debtor] is otherwise liable under any applicable law, whether or not ... from acts or omissions of the Debtor, its predecessors, subsidiaries, or Affiliates, ... or any other Entity for or with which the Debtor or its successors are or may be liable ..." *Id.* The plan draws a distinction between "Direct" asbestos claims—those "resulting from such individual's exposure to asbestos related to" the Debtor, Plan § 1.15(b), and "Indirect" asbestos claims—those "based on a right of contribution, reimbursement, subrogation, or indemnity, ... arising out of or related to an Asbestos Claim," Plan § 1.15(a). The latter, it appears, would be claims back against the Debtor by third parties that are found jointly liable with the Debtor, to a person who was actually injured by exposure to asbestos "related to" the Debtor.

posed trustee for such qualification constitute "Qualified Current Direct" claims. The treatment for these claims requires the trustee to "make an immediate partial distribution to [the holders of] each of [them] pursuant to the provisions of the Trust Distribution Procedures," from the initial funding provided by the Debtor and its parent. It also entitles these claimants to a "pro rata share" of funding provided by any insurer that had settled with the Debtor on the issue of coverage via a lump-sum payment to the trust. Plan § 3.5.

Claims asserted in the future, on account of the Debtor's "Direct" asbestos-related liability, are then to be treated by the trust pursuant to the Trust Distribution Procedures, and to receive distribution from the trust *res* in the amount fixed by the matrix, as funds are available in the trust and in the discretion of the trustee. Plan § 3.5; TDP §§ 4.1—4.4. Claims on account of the Debtor's "Indirect" liability, defined at § 1.15(a) of the plan as those "based on a right of contribution, reimbursement, subrogation, or indemnity," are to be paid *"pari passu* with Direct Asbestos Claims" from trust assets other than monies paid by insurers to the trust in settlement of coverage litigation. Plan § 3.5.

Several insurers object to the plan's structure for the treatment of asbestos claims, in particular to the distinction in the timing of these claimants' realization (an immediate distribution to holders of pending asbestos-related personal injury claims, with all future-asserted claims relegated to a later distribution from remaining assets in the trust).

The insurers lack standing to object to this aspect of the plan, however, under the rationale just applied to their objections on the theory of classification. The issue here goes *only* to the entitlement to share from a fixed fund, the "pot" to be provided to the trust by the Debtor and its parent plus the proceeds of settlements of insurers' coverage liability. Only those parties with a right to share from that pot have standing to complain of the way it is to be divided, initially or over time. In particular, it is only those parties who may raise the specter that some components of the trust *res* may be exhausted before all possible claims are paid their fixed due under the matrix.[56] *Cf. In re Mid–Valley, Inc.*, 305 B.R. 425, 431 (Bankr.W.D.Pa.2004) (insurers lacked standing to object to confirmation on issue of structure of § 524(g) matrix and payment amounts under it, where plan does not purport to bind insurers to indemnify debtor or trust for payments made pursuant to matrix).

### *3. Pre-petition Solicitation of Acceptances.*

■ Over the several years before its Chapter 11 filing, the Debtor prepared to present its plan for confirmation via a "pre-packaged" procedure. As part of that, the Debtor planned to meet the various requirements of 11 U.S.C. § 1129 relating to creditor acceptance via a prepetition solicitation and vote.[57] After com-

---

**56.** This is an obvious, and omnipresent, tension in Chapter 11 cases that are precipitated by asbestos-related liability. Ronald Barliant, Dimitri G. Karcazes, and Anne M. Sherry, *From Free–Fall to Free–for–All: The Rise of Pre–Packaged Asbestos Bankruptcies*, 12 Am. Bankr.Inst. L.Rev. 441, 452 (2004). The insurers certainly do not offer a viable alternative to a distribution prioritized in time.

Their insinuation that the trust could defer all distribution until an unknown date a half-century or more in the future certainly lacks all savor, from the standpoint of a claimant who is currently afflicted with advanced mesothelioma.

**57.** As to the general format and process of a "pre-packaged" reorganization case, see *In re NRG Energy, Inc.*, 294 B.R. 71, 82 (Bankr.

mencing this case, the Debtor filed documentation regarding the process it had used to obtain a vote from the members of Class 3–B.[58] The Debtor maintains that the vote described in those documents evidences an acceptance of the plan by Class 3–B.

Several insurers object to confirmation, on the ground that the Debtor's pre-petition solicitation did not satisfy various provisions of governing law, including 11 U.S.C. § 1126(b), or that the resultant vote does not evidence an acceptance by a requisite majority of the holders of claims within Class 3–B. This objection goes to the procedural requirements for confirmation, and not to the content of the plan on its face. Again, however, the insurers lack standing to raise this issue. Because the plan does not alter any of the insurers' legal or contractual rights, they would not be aggrieved by its confirmation; there would be no "injury in fact" to them that would result from the creation or empowerment of the trust or its operation under the plan and TDP. Thus, they may not be heard in opposition to confirmation on the circumstances of the pre-petition solicitation or the characteristics of the resultant vote.[59]

*4. Releases of Third–Party Affiliates.*

■ Section 7.1 of the plan governs "Discharge and Release." After detailing the nature and effect of the discharge that the Debtor would receive on the effective date of the plan, it provides:

In addition, on the Effective Date, the Debtor shall be deemed to have ... released of [sic] all Claims constituting Released Claims, including but not limit-

ed to all causes of action, whether known or unknown, either directly or derivatively through the Debtor against the Released Non–Debtor Parties on the same subject matter as any of the Claims assumed by the Trust, and ... discharged and released of [sic] all causes of action of the Debtor whether known or unknown, against the Released Non–Debtor Parties.

Section 1.107 of the plan defines "Released Claims" as "any and all claims that the [Debtor] may now or in the future have against" certain parties, defined in § 1.106 of the plan as the Debtor's parent company and that company's past, present, and future officers, directors, employees, legal representatives, and agents. Section 1.107 goes to some pains to specify that the inter-company claims in question include "creditor claims and causes of action against any of" the release parties "such as fraudulent transfer or fraudulent conveyance claims ..., denuding the corporation claims, single business enterprise claims, corporate trust fund claims" and claims under the theories of "mere instrumentality, agent, or alter ego," "domination and control," or "successor in interest" theories that could make the parent corporation and its individual principals "directly or indirectly ... liable for" asbestos-related claims "or other claims that have their origins in acts or omissions of" the Debtor.

Several insurers have objected to confirmation on the merits of this proposed release. Their objections implicate a "restructuring" of the Debtor's business enterprise and its relationship with its parent and several related companies, which did take place several years before its

---

D.Minn.2003) and *In re Combustion Engr'g, Inc.,* 391 F.3d at 201 n. 4.

**58.** The documentation consists of the Affidavit of James L. Baillie, Esq., with attachments, filed on January 6, 2005, docket no. 17.

**59.** This does not mean that the Debtor will be relieved of its duty to make a prima facie showing on the propriety of its "pre-pack" procedure.

bankruptcy filing. Their theory is that this restructuring effected an avoidable fraudulent transfer of part or all of the value of the Debtor's going concern, to some other entities in the structure.[60] Their argument as to confirmation apparently is that the plan's release of the claims violates non-bankruptcy law, as well as the substantive requirements for a compromise or settlement under the judicial construction of Fed. R. Bankr.P. 9019.[61]

Again, however, the insurers lack standing to raise and be heard on this issue. If there has in fact been a fraudulent transfer of value out of the Debtor, and if that event were redressed via avoidance and appropriate relief against the recipient(s), it would result in an enhancement of the Debtor's current value, or an augmentation of the bankruptcy estate, and a corresponding increase in the amount that should be paid to creditors under the plan. The only identifiable beneficiaries of this boon would be the holders of asbestos claims, who could object to confirmation on the ground that the recovered value should be directed to the trust to enhance its future ability to perform under the Trust Distribution Procedures.[62] No insurer, whether holding the status of creditor or not, is to receive a distribution from the trust; those insurers who hold claims under retroactive-premium arrangements are to be paid in full shortly after confirmation, from funds of the Debtor other than those committed to the trust. A non-settling insurer's legal obligations of indemnification on individual asbestos-related claims are not affected in any way by the amount of funding the trust is to receive, from the Debtor or the parent company. Because, again, the insurers have no stake in the funding of the trust or the administration of its assets, they have no interest in whether the Debtor would act properly in releasing these related entities from any liability on account of the restructuring or otherwise, thereby forgoing a possible asset of the estate.

One last point is worthy of mention on this issue. At oral argument, GAIC's counsel repeatedly insisted that the insurers should be allowed to raise, pursue, and object to confirmation on the matter of the alleged fraudulent transfer, because "if we didn't get into this, nobody else would." This statement is more than a bit of artifice, it is a chunk. It completely elides a large gap in its presumptions. Giving this argument credence would so elevate the

---

60. This was all voiced in terms of great foreboding and baleful portent, but even greater vagueness. The insurers are not greatly to be slighted for the latter, however. They had not done a thorough investigation or discovery on the underlying transactions when this issue was argued, and had not really had the time to do so.

61. In this circuit, the substantive considerations for the approval of a compromise or settlement involving a bankruptcy estate were first set forth in *Drexel v. Loomis,* 35 F.2d 800, 806 (8th Cir.1929). They were reiterated in *In re Flight Transportation Corp. Securities Litigation,* 730 F.2d 1128, 1135 (8th Cir. 1984). *See also In re New Concept Housing, Inc.,* 951 F.2d 932 (8th Cir.1991).

62. This would all go to the "best interests of creditors" test of 11 U.S.C. § 1129(a)(7). In pertinent part, that statute requires a proponent to prove:

(7) With respect to each impaired class of claims or interests—
(A) each holder of a claim or interest of such class—
(I) has accepted the plan; or
(II) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . .

insurers' "generalized grievance" with the Debtor's reorganization effort, that the second aspect of prudential standing would be quite ravaged.

### 5. "Securities"-Related Requirements of 11 U.S.C. § 524(g).

██ Under § 5.3 of the plan, the obligations of the Debtor and its parent company to fund the trust after the initial payment on the effective date are to be evidenced by a promissory note in favor of the trust, and "secured by 51% of the voting shares of" the Debtor, as well as a security interest in all of the Debtor's assets, both granted to the trust.

Several insurers object that this grant of a security interest is not sufficient to satisfy the requirement of § 524(g)(2)(B)(i)(II)-(III) [63], that the trust "is to be funded . . . by the securities" of the Debtor, and "is to own, or by the exercise of rights granted under [the] plan would be entitled to own if specified contingencies occur, a majority of the voting shares of" the Debtor and/or its parent.

Under the statute and the plan, the primary obligations to fund the trust inure in the Debtor and its parent. 11 U.S.C. §§ 524(g)(2)(B)(i)(II)—(III); Plan §§ 5.1—5.3. The beneficiaries of that obligation are the holders of asbestos claims, present and future, who would receive distributions from the trust. Of all constituencies to this case, they are the only ones with a vested interest in the trust's ability to meet its payment obligations under the Trust Distribution Procedures. Hence, they are the only parties in the case who have standing to question whether the arrangements to secure the trust's performance are fiscally sound and in compliance with the legal and factual requirements of § 524(g).

In the first and last instances, the insurers do not have such standing. They are not the named beneficiaries of the trust, and do not even hold the status of impaired creditors under the plan. Disbursements from the trust will not be made from the insurers' monies, absent their consent via a settlement on coverage that would be effected through a payment into the trust. And, the reduction of the trust's corpus will not affect them in the end, whether they have duties of indemnification or not. If they have no duty of indemnification, or if the trustee chooses not to seek indemnification for matrix-based payments to claimants, the insurers will not be called to support the trust's performance at all. If there is an adjudication of coverage and the trustee seeks indemnification for any amounts paid by the trust, the insurers' ultimate liability on account of claims against the Debtor will be no more or less than what they would have been, had the Debtor never gone into bankruptcy and had the trust never been established or activated. Again, there is no cognizable injury-in-fact to the insurers' interests that would arise from any want

---

**63.** The full text of these provisions set the following, as prerequisites to the entry of the "channeling injunction":

(I) the injunction is to be implemented in connection with a trust that, pursuant to the plan of reorganization—

. . .

(II) is to be funded in whole or in part by the securities of 1 or more debtors involved in such plan and by the obligation of such debtor or debtors to make future payments, including dividends;

(III) is to own, or by the exercise of rights granted under such plan would be entitled to own if specified contingencies occur, a majority of the voting shares of—
(aa) each such debtor;
(bb) the parent corporation of each such debtor . . .
. . . and
(IV) is to use its assets or income to pay claims and demands . . .

of compliance with the funding requirements of § 524(g) on the part of the plan or the Debtor as its proponent.

As a result, the insurers cannot be heard in objection to the plan on its conformity with either § 524(g)(2)(B)(i)(II) or (i)(III).

*F. Conclusion, on Standing Issues*

Thus, because the objecting insurers either lack constitutional standing, or are to be deprived of standing on prudential considerations, or both, as to the five groups of issues just noted, they will not be heard in objection to confirmation of the Debtor's plan on those matters, when a final version of the plan is presented to the court for that action. *Cf. In re Mid–Valley, Inc.*, 305 B.R. at 428–433 (insurers whose duties of coverage would not be adjudicated by confirmation and that would not be compelled under plan to directly fund § 524(g) trust generally lack standing to move for dismissal of Chapter 11 case on ground that debtor's plan is unconfirmable).

*III. Plan's Provision for Exoneration of Debtor and Certain Third Parties.*

*A. Introduction*

Section 10.9 of the plan provides that the Debtor, its parent company, the Asbestos Claimants' Committee, and the Legal Representative, as well as certain persons affiliated with them,

> shall not be liable, other than for willful misconduct, to any holder of a Claim or Interest or any other Entity with respect to any action, omission, forbearance from action, decision, or exercise of discretion taken at any time prior to the Effective Date [of the plan] in connection with

certain described types of activity, basically anything done in furtherance of the Debtor's Chapter 11 case and its effort to obtain confirmation of a plan, plus "the management or operation of the debtor or the discharge of their duties under the Bankruptcy Code." GAIC and U.S. Fire object to this "exoneration provision" on separate and overlapping grounds.

U.S. Fire characterizes the provision as a grant of release, or even discharge, to third parties that are not petitioners for relief in this case. It argues that this violates both an express provision of the Bankruptcy Code and the basic structure of bankruptcy relief. GAIC terms the provision a disguised "sword" for manipulation in the coverage action, that could bar it from maintaining the defenses of bad faith and collusion that it has raised there under non-bankruptcy law.

The Debtor, in response, insists that the provision would lie only against actions to obtain affirmative relief against the "exonerated" parties participating in this case, and would shelter only the conduct that they engaged in up to the effective date of the plan.

*B. Discussion*

*1. U.S. Fire's Objection.*

In arguing that the Debtor cannot use the confirmation of its plan to obtain an exoneration of third parties from liability, U.S. Fire primarily relies on 11 U.S.C. § 524(e):

> Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt.

 "In a typical Chapter 11 proceeding, the confirmation of the reorganization plan discharges the debtor of any debt that arose prior to the confirmation. 11 U.S.C. § 1141(d)(1). That 'discharge' does not result in the extinguishment of the underlying debt but merely releases the debtor from personal liability." *Star Phoenix Min. Co. v. West Bank One*, 147 F.3d 1145, 1147 n. 2 (9th Cir.1998) (Lay, J.,

sitting by designation). *See also Matter of Edgeworth*, 993 F.2d 51, 53 (5th Cir.1993). Though the confirmation of a plan binds all creditors whether they have accepted the plan or not, 11 U.S.C. § 1141(a), "[§] 524(e) acts as a limitation on the effect of this discharge." *Matter of Specialty Equipment Companies, Inc.*, 3 F.3d 1043, 1046 (7th Cir.1993). Thus, the liability of co-debtors or guarantors of a debtor's debt is not affected by a grant of discharge to that debtor. *Star Phoenix Min. Co. v. West Bank One*, 147 F.3d at 1147 n. 2; *Underhill v. Royal*, 769 F.2d 1426, 1432 (9th Cir.1985). *See also In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir.1995); *Matter of Zale Corp.*, 62 F.3d 746, 760 (5th Cir.1995). Cf. *In re Western Real Estate Fund, Inc.*, 922 F.2d 592, 601 (10th Cir. 1990) ("Neither the confirmation of a plan nor the creditor's recovery (of partial satisfaction) thereunder bars litigation against third parties for the remainder of the discharged debt."), modified sub nom. *Abel v. West*, 932 F.2d 898 (10th Cir.1991).

 Under these authorities, it would go without saying that the confirmation of the Debtor's plan would not, *in se*, operate to discharge the liability of any co-debtor of the Debtor, on any pre-petition debt. Further, the Debtor could not expressly provide in its plan for a discharge of such co-debtors' liability, in so many words, without violating the dictate of § 524(e), and a plan with such a term should not be confirmed. 11 U.S.C. § 1129(a)(1) (requiring, for confirmation, that "[the] plan com-

plies with the applicable provisions of" the Bankruptcy Code); *In re Lowenschuss*, 67 F.3d at 1401–1402, and cases cited therein.

 However, that is not what the exoneration provision at bar would do. Such clauses are an expression of an immunity from suit granted to a debtor as plan proponent, the parties who supported it and participated in structuring the plan, and the agents of all of them. *In re PWS Holding Corp.*, 228 F.3d 224, 245 (3rd Cir. 2000); *In re Western Asbestos Co.*, 313 B.R. 832, 846–847 (Bankr.N.D.Cal.2003). As structured, this immunity is limited in at least two dimensions—and one of them makes it quite distinct from a discharge in bankruptcy. First, the exoneration applies only to the actions taken by these supporters of the plan up to the effective date of the plan. Second, it does not shelter any exonerated party from liability for willful misconduct in its engagement with the reorganization process.[64] As a result, considerations under § 524(e) are inapposite here. The Debtor's exoneration proposal is not unlike the terms for "limited release" in *PWS Holding Corp.*—which, the 3rd Circuit held, "does not come within the meaning of § 524(e) and is consistent with the standard of liability under the Code." 228 F.3d at 230. *See also In re Asbestos Claims Mgmt. Corp.*, 294 B.R. 663, 689–690 (N.D.Tex.2003); *In re Western Asbestos Co.*, 313 B.R. at 846–847; *In re Celotex Corp.*, 204 B.R. 586, 626–627 (Bankr. M.D.Fla.1996).[65]

---

**64.** By contrast, of course, a discharge in bankruptcy absolves all liabilities, no matter how they were incurred, and if discharge is granted without the timely taking of an exception under 11 U.S.C. § 523(c) a creditor is forever barred from enforcing a debt that was incurred by the fraudulent or malicious act of its debtor. 11 U.S.C. § 524(a)(2).

**65.** The Code contains corollary authority that evidences a similar congressional intent as to

liability that could be asserted against plan proponents on the basis of their post-petition conduct in the case:

A person that solicits acceptances or rejection of a plan, in good faith and in compliance with the applicable provisions of [the Bankruptcy Code], or that participates, in good faith and in compliance with the applicable provisions of [the Bankruptcy Code], in the offer, issuance, sale, or purchase of a security, offered or sold under

U.S. Fire's objection to the exoneration provision is without merit, and is overruled.

### *2. GAIC's Objection.*

■ GAIC poses its objection to the exoneration provision against the backdrop of the coverage action. Apparently it is defending that lawsuit, in part, on the ground that it is excused from any further duty of defense and indemnification because the Debtor lacked good faith when it did not include GAIC and the other insurers in the negotiations for its "pre-pack" reorganization plan.[66]

The structure of the exoneration provision wholly undercuts this argument. By its terms, the exoneration would bar only *affirmative relief* that could be sought against the exonerated parties. Obviously, an action for damages was the overriding concern. The exoneration provision makes no mention of any putatively-injured party raising the relevant conduct by exonerated parties in the defense of any litigation. Thus, it cannot be read to bar such use. GAIC has never asserted a right to recover in damages on account of its grievance with the pre-petition negotiation process. In fact, it admits in its submissions for this motion that its remedy would be to "release [its] obligation [of defense and indemnification] to the extent of the prejudice" from the Debtor's alleged lack of good faith in its exclusion of the insurers from its preparations for this case.

Arguably, because GAIC was exclusively concerned with its defensive options in the coverage litigation and the exoneration provision does not purport to affect them, GAIC lacked standing to object to confirmation on this ground. *In re Combustion Engr'g, Inc.*, 391 F.3d at 218. In any event, GAIC's objection fails on the defects of its own internal logic, and is overruled.

### *CONCLUSION*

The Debtor is entitled to essentially all of the relief by way of summary judgment that it sought as to the three groupings of major issues treated in this order.

### *ORDER*

IT IS HEREBY ORDERED AND ADJUDGED:

1. To the extent set forth in the following terms of this order, the Debtor's motion for summary judgment is granted.

2. Confirmation of the Debtor's amended plan, the formation and operation of the trust that it contemplates, and the trust's administration of asbestos-related personal injury claims pursuant to the plan, would not alter or affect the rights of any of its liability insurers under the "no-action" provisions of their policies.

---

the plan, of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities.

11 U.S.C. § 1125(e). *See Yell Forestry Products, Inc. v. First State Bank of Plainview*, 853 F.2d 582, 584 (8th Cir.1988).

**66.** It is not clear whether, or how, this precise theory of defense is in suit in the coverage action at present. That matter was in litigation for several years before the commencement of this case. Clearly, until the Debtor actually filed for Chapter 11, a defense based upon conduct in connection with the Chapter 11 case was simply not ripe. There is nothing in the record here to evidence that the state court has granted GAIC leave to amend its answer to raise the Debtor's actions in connection with its Chapter 11 case as a further basis for a bad-faith defense. Despite all that, GAIC's argument will be treated as if it had a grounding in the record of the coverage action.

3. Confirmation of the Debtor's amended plan, the formation and operation of the trust that it contemplates, and the trust's administration of asbestos-related personal injury claims pursuant to the plan, would not violate the "consent to settlement" provisions of any policy of liability insurance that the Debtor has with any of its insurers.

4. Confirmation of the Debtor's amended plan, the formation and operation of the trust that it contemplates, and the trust's administration of asbestos-related personal injury claims pursuant to the plan, would not, per se, terminate, lessen, or otherwise affect any personal duty of the Debtor under contract or law to cooperate with its liability insurers in the response to any claim tendered to such insurers for indemnification by them.

5. Any determination of the aggregate amount of possible future demands for payment to be made on account of the Debtor's liability for asbestos-related personal injury claims, that would be made by this Court in the proceedings on confirmation of the Debtor's plan, will have no effect binding on any party in any other lawsuit or proceeding in any other forum. Further, the Debtor, the trust to be established pursuant to its plan, the trustee of that trust, and all other parties bound by the confirmation of the Debtor's plan, shall be Judicially estopped from asserting any such binding effect in any other forum.

6. Other than the substitution of the trust for the Debtor as the insured, and the assignment to the trust of all of the Debtor's rights under all liability insurance coverage extant when the Debtor filed for relief under Chapter 11, the confirmation of the Debtor's amended plan, the formation and operation of the trust that it contemplates, and the trust's administration of asbestos-related personal injury claims pursuant to the plan, will neither determine the rights or duties of any party in relation to such liability insurance coverage, nor alter or affect any duty or right in hearing in any such party in the relationship of insurer to insured under any such liability insurance coverage.

7. The Debtor's liability insurers do not have standing to be heard in objection to confirmation of the Debtor's plan, and will not be heard in such objection when that plan is before the Court for confirmation, on the following issues:

a. The structure of the classification of asbestos-related personal injury claims under Class 3–B of the plan;

b. The treatment of claims under Class 3–B of the plan;

c. The procedure by which the Debtor solicited and obtained acceptances of its plan before the commencement of this case;

d. The release of liability under Section 7.1 of the plan; and

e. The Debtor's satisfaction of the requirement of 11 U.S.C. § 524(g)(2)(B)(i)(II) and (i)(III).

8. The provision under Section 10.9 of the Debtor's plan for exoneration of certain parties from liability for certain acts does not violate applicable law, and the Debtor's plan may not be denied confirmation on account of the content of that provision.